**STOP H–3 ASSOCIATION, a Hawaiian non-profit corporation; Life of the Land, a Hawaiian non-profit corporation; Hui Malama Aina O Ko'Olau, Plaintiffs–Appellants,**

v.

**Elizabeth DOLE, as Secretary of the United States Department of Transportation; William R. Lake as Hawaii Division Engineer, Federal Highways Administration; and Edward Hirata, as Director of the Department of Transportation of the State of Hawaii, Defendants–Appellees.***

No. 87–2204.

United States Court of Appeals, Ninth Circuit.

Argued Nov. 13, 1987.

Decided March 20, 1989.

* Substitution of officers in their official capacity have been made pursuant to Fed.R.App.P. 43(c).

Boyce R. Brown, Jr., Brown, Johnston & Day, Honolulu, Hawaii, for plaintiffs-appellants.

Kathryn A. Oberly, Sp. Deputy Atty. Gen., State of Hawaii, Mayer, Brown & Platt, Washington, D.C., for defendants-appellees.

Before SCHROEDER, PREGERSON and BRUNETTI, Circuit Judges.

PREGERSON, Circuit Judge:

## I. BACKGROUND

This appeal involves the construction of an interstate highway project in Hawaii which has been the subject of litigation now spanning some sixteen years.[1] The

---

1. *See Stop H–3 Ass'n v. Volpe,* 349 F.Supp. 1047 (D.Hawaii 1972); *Stop H–3 Ass'n v. Volpe,* 353 F.Supp. 14 (D.Hawaii 1972); *Stop H–3 Ass'n v. Brinegar,* 389 F.Supp. 1102 (D.Hawaii 1974), *rev'd. sub nom. Stop H–3 Ass'n v. Coleman,* 533 F.2d 434 (9th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976); *Stop H–3 Ass'n v. Coleman,* 533 F.2d 434 (9th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976); *Stop H–3 Ass'n v. Lewis,* 538 F.Supp. 149 (D.Hawaii 1982), *aff'd in part and rev'd in part,* 740 F.2d 1442 (9th Cir.1984), *cert. denied,* 471

litigation began in 1972, when the Stop H–3 Association sought permanently to enjoin construction of the highway, known as the H–3 project, out of concern for its impact on the environment. That same year the parties worked out a stipulation providing that construction would proceed at both ends of H–3, but would cease in the central portion of the highway pending a trial on the merits.[2] The district court accordingly issued a temporary injunction enjoining work on the project pending resolution of the action. C.R. 43.

The consolidated complaint of the environmental organizations, appellants here,[3] raised a number of issues, two of which are relevant to this appeal. First, appellants contended that appellees[4] had violated the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 ("NEPA"), by filing a deficient Environmental Impact Statement (EIS).

Second, appellants maintained that appellees had not complied with section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303, and section 18 of the Federal Aid Highway Act of 1968, 23 U.S.C. § 138. These sections contain nearly identical language and are commonly referred to collectively as "section 4(f)" or the "4(f) statutes." Under section 4(f), the Secretary

> shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

The Secretary's determination that the conditions of section 4(f) are satisfied is known as a "section 4(f) statement."

The case went to trial in 1974. After the trial, the district court found that appellees had not violated NEPA, section 4(f), or any other federal, state or local provisions. As a result, it lifted the preliminary injunction. *Stop H–3 Ass'n v. Brinegar*, 389 F.Supp. 1102 (D. Hawaii 1974), *rev'd sub nom. Stop H–3 Ass'n v. Coleman*, 533 F.2d 434 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976). However, on appeal to this court, appellants sought and obtained reimposition of the preliminary injunction. *Stop H–3 Ass'n v. Coleman*, 533 F.2d 434 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976). We held that appellees had failed to comply with section 4(f) before approving the release of federal funds for H–3. *Id.* at 445. Specifically, we held that the Moanalua Valley, through which H–3 would pass, was protected land; therefore we rejected the Secretary's argument that section 4(f) did not apply. *Id.*

Appellees subsequently filed a 4(f) statement for Moanalua Valley, but the Secretary found reasonable alternatives to using that land and did not approve the project. Appellees then decided to reroute H–3 to the north, filing a supplemental EIS (SEIS)

U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985); *Stop H–3 v. Dole*, 740 F.2d 1442 (9th Cir.1984), *cert. denied*, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985).

**2.** The proposed central portion extended from the Halawa Interchange in the west to the Halekou Interchange in the east.

**3.** The appellants are Stop H–3 Association and Life of the Land, both of which are non-profit organizations chartered for the purpose of opposing the construction of H–3, and Hui Malama Aina O Ko'olau, an unincorporated associa-

tion formed "to protect the Hawaiian people, the Hawaiian lifestyle, and the land from destruction."

**4.** The appellees are the Secretary of the United States Department of Transportation, the Hawaii Division Engineer for the Federal Highway Administration (FHWA), and the Director of the Department of Transportation of the State of Hawaii. As this litigation has progressed, the incumbent Secretary of Transportation has been substituted for his or her predecessor as a named defendant, pursuant to Fed.R.App.P. 43(c)(1).

and 4(f) statement which the Secretary approved in 1981. In the meantime, the district court continued to enforce the preliminary injunction, holding that the new route was within the purview of the 1972 stipulation.

Appellants challenged the new proposal, raising forty-eight separate claims. Appellants were primarily concerned with the impact of the new route on two protected areas, the Pali Golf Course and Ho'omaluhia Park. After a 1981 trial on the merits, the district court ruled in favor of appellees on nearly all counts. Most importantly, the district court affirmed the Secretary's determination that there was no prudent alternative to the new proposal, and approved both the EIS and SEIS. Having identified only minor noncompliance with NEPA and section 4(f), the district court decided to lift the preliminary injunction. *Stop H–3 Ass'n v. Lewis,* 538 F.Supp. 149 (D.Hawaii 1982).

A second appeal to this court ensued, and we once again reimposed the preliminary injunction. We were not convinced that the "Makai Realignment" and the "No Build Alternative" were imprudent. We held that such a determination was an abuse of discretion on the record as it then existed, and remanded the matter to the Secretary for further consideration. We affirmed the district court in all other respects. *Stop H–3 Ass'n v. Dole,* 740 F.2d 1442 (9th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985).

On October 18, 1986, the Continuing Appropriations Bill for Fiscal Year 1987, Pub. L. No. 99–500, 100 Stat. 1783 (later reenacted as Pub.L. No. 99–591, 100 Stat. 3341) became law. Section 114 of this bill, 100 Stat. 1783–349 (later reenacted as 100 Stat. 3341–349), ordered the Secretary to approve construction of H–3 "notwithstanding" section 4(f). On January 16, 1987, the Secretary approved the section of H–3's central portion lying between the Halawa and Kaneohe interchanges, but suspended approval for the small segment lying between the Kaneohe and Halekou interchanges.

Appellees then moved for dismissal of the complaint, arguing that section 114 had rendered moot all issues raised in appellants' complaint that remained after this court's 1984 decision. Appellees also moved for a lifting of the preliminary injunction, arguing that the requirements of the 1972 stipulation, NEPA and its regulations had all been complied with. The district court agreed with appellees, and on May 26, 1987 dismissed the complaint and lifted the preliminary injunction. C.R. 507, 508.

In this third appeal, appellants challenge the district court's decision to dismiss the complaint and lift the preliminary injunction. Specifically, they argue that the requirements of the 1972 stipulation, NEPA, and the applicable regulations have not been satisfied. They also contend that section 114 is an unconstitutional exercise of congressional power, violating the Spending Clause, the equal protection component of the Fifth Amendment's Due Process Clause, and the principle of separation of powers. Appellants seek reversal of the district court's decision and reimposition of the preliminary injunction.

## II. STANDARD OF REVIEW

We review de novo the district court's decision to grant a motion to dismiss for mootness. *See Sample v. Johnson,* 771 F.2d 1335, 1338 (9th Cir.1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986). The district court's decision to lift the preliminary injunction is reviewed for abuse of discretion. *See Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1021 (9th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

## III. DISCUSSION

### A. NEPA and the Stipulated Injunction

Appellants argue that the district court erred in holding that appellees had complied with the terms of the stipulated injunction. According to appellants, the terms of the stipulation required that the court determine the adequacy of a Third

Supplemental Environmental Impact Statement, which appellees were in the process of preparing, before construction of H-3 could proceed. Because appellants were not given the opportunity to litigate the adequacy of the Third SEIS, they argue, the injunction should be reinstated.

Appellants also contend that appellees' decision to prepare a Third SEIS lengthened the EIS process beyond the approval of the 1982 EIS and thus rendered premature the district court's dismissal of the action. According to appellants, the district court could not dismiss the action prior to its approval of the Third SEIS.

### 1. *The Stipulation*

In 1972, the parties entered into a stipulation that provided, in relevant part:

It is agreed that Defendants shall not permit construction, further acquisition of right of way, or further letting of contracts on the Moanalua–Haiku Segment until the adequacy of the Final Environmental Impact Statement is determined by this Court.

C.R. 34, at 3.[5]

In 1980, FHWA approved a final SEIS for the North Halawa Valley alignment of the H-3 project. Together with the 1972 Moanalua Valley EIS ("1972 EIS") and the 1973 Supplemental EIS ("1973 Preface"), the 1980 SEIS constituted the EIS for the North Halawa Valley alignment of the project. Location and design approval for the H-3 project was given on February 5, 1981. On April 10, 1981, appellants filed a

142 page, 48 count, Amended and Supplemental Complaint for Declaratory and Injunctive Relief, challenging the appellees' decision to proceed with the H-3 project.

In its decision of April 8, 1982, the district court held that the 1972 EIS and 1973 Preface complied with the requirements of NEPA and were properly approved. *Stop H-3 Ass'n v. Lewis*, 538 F.Supp. 149, 183 (D. Hawaii 1982), *aff'd in part and rev'd in part*, 740 F.2d 1442 (9th Cir.1984), *cert. denied*, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). The district court further held that the 1980 SEIS was properly prepared and circulated and adequately discussed the project's impact upon North Halawa Valley. *Id.*[6] The court held that the EIS as a whole "sufficiently addresses the project's socio-economic impacts and relationship to the Oahu General Plan." *Id.* The district court however ordered appellees to prepare and circulate another supplemental EIS to reflect "new and significant" information that had arisen since the draft 1980 SEIS was circulated and not discussed in the North Halawa Valley EIS. *Id.* at 183, 184.[7] The court also set aside the Secretary's section 4(f) determination concerning Ho'omaluhia Park on the ground that "the 4(f) statement does not adequately support the finding that all possible measures have been taken to minimize harm to the park." *Id.* at 183. The court however affirmed the Secretary's conclusion that no feasible and prudent alternatives exist to the use of the park. *Id.* Finally, holding that conditions had changed sufficiently since imposition of the

---

**5.** Concurrent with the signing of the stipulation, the district court issued a Decision and Order imposing an injunction on the H-3 project. C.R. 43. The Decision and Order, dated October 18, 1972, 349 F.Supp. 1047, stated in pertinent part:

Therefore, it is ordered that the defendants, their agents and employees, and any persons in active participation with them are hereby enjoined from commencing or continuing or permitting the commencement or continuation of work or preparation as provided in contracts numbered 788, 856, 835, 1462, and 1831. State and federal defendants are specifically enjoined from releasing any state or federal funds in payment for any work done under these contracts subsequent to the date of this order and until the final determination

of the causes of action set forth in plaintiffs' complaint....

*Id.* at 1049.

**6.** The district court also found that appellees had complied with the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.*, the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, the Federal-Aid Highway Act, 23 U.S.C. §§ 101 *et seq.*, and regulations promulgated thereunder. 538 F.Supp. at 183.

**7.** This information was contained in the H-3/OMEGA Station Collocation Studies, the Federal Highway Administration's Region 9 Staff Analysis, and the Ho'omaluhia Park 4(f) Statement. 538 F.Supp. at 183.

injunctions to justify terminating those injunctions and ordering new relief, the district court vacated the then-extant injunctions against the H-3 project and set aside the Secretary's grant of location and design approval for the project. *Id.*

Appellees accordingly prepared a second SEIS, which FHWA approved on September 28, 1982.[8] The Secretary of Transportation thereupon granted new location and design approvals for the H-3 project on November 12, 1982. Appellants did not challenge the validity of these actions; they have never contended that appellees failed to comply with the district court's 1982 order.

Appellants however appealed from the district court's 1982 decision. In 1984, we affirmed the district court's 1982 ruling in respect to the adequacy of the 1980 EIS under NEPA. *Stop H-3 Ass'n v. Dole,* 740 F.2d 1442, 1465 (9th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985).[9] We reversed, however, the district court's conclusion that the Secretary had correctly determined, under section 4(f), that there were no feasible and prudent alternatives to the "constructive use" of Ho'omaluhia Park. *Id.* at 1450–58. We therefore ordered the district court to reinstate the injunctions against further construction of H-3 pending the Secretary's compliance with section 4(f) as the statute applied to Ho'omaluhia Park. *Id.* at 1465.

Following this court's 1984 decision, therefore, the only obstacles remaining to construction of H-3 were the requirements of section 4(f) and the district court's approval of the Final EIS. On October 18, 1986, President Reagan signed Public Law No. 99–500, 100 Stat. 1783.[10] Section 114, 100 Stat. 1783–349, provides:

(a) The Secretary of Transportation shall approve the construction of Interstate Highway H-3 between the Halawa interchange to, and including the Halekou Interchange (a distance of approximately 10.7 miles), and such construction shall proceed to completion notwithstanding section 138 of title 23 and section 303 of title 49, United States Code [i.e., section 4(f)].

(b) Notwithstanding section 102 of this joint resolution the provisions of subsection (a) shall constitute permanent law.

The clear intent and effect of this statute is to exempt the H-3 project from the requirements of section 4(f). As we explain below, section 114 does not suffer from any of the constitutional infirmities advanced by appellants. Therefore, enactment of section 114 left only one impediment to construction of H-3: approval of a Final EIS for the project.

### 2. *The Third SEIS*

After enactment of section 114, appellees carried out a formal reevaluation of the H-3 project pursuant to 23 C.F.R. 771.-129(c)(2).[11] This regulation requires such reevaluations when major steps to advance a project have not occurred within three years after the approval of the final EIS. Based on this reevaluation, defendants began to prepare a Third SEIS, to consider the impact of the highway on archaeological resources and banana farmers in the vicinity of the proposed Kaneohe Interchange (the Luluku area). A draft Third SEIS was made available to the public on January 29, 1987, and official notice of its availability was published in the Federal

---

**8.** For the sake of convenience, this opinion will refer to the Halawa Valley EIS, consisting of the 1972 EIS, the 1973 Preface, the 1980 SEIS, and the 1982 Second SEIS, as the "1982 EIS."

**9.** We also affirmed the district court's determination that appellees had complied with the Endangered Species Act and the portions of the Federal–Aid Highway Act other than section 4(f). 740 F.2d at 1465.

**10.** For reasons unrelated to section 114, this statute was reenacted as Pub.L. No. 99–591, 100 Stat. 3341–349, and signed by the President on October 28, 1986. The language of section 114 is identical in both statutes.

**11.** This portion of the Code of Federal Regulations was revised as of April 1, 1988. *See* 23 C.F.R. § 771.130 (1988). For convenience, however, this opinion will refer to those provisions in force at the time appellees carried out the reevaluation.

Register on February 6, 1987. 52 Fed.Reg. 3856 (1987).

On January 16, 1987, based on the reevaluation, the Acting Division Administrator of FHWA approved the H–3 project, authorizing detailed design and construction work. At the same time, however, the Acting Division Administrator suspended his approval insofar as it would have authorized design and other project-related work in the vicinity of the proposed Kaneohe Interchange, pending completion of the Third SEIS.

On February 11, 1987, appellees filed a joint motion to dismiss the action, on the grounds that the unchallenged issuance and FHWA approval of the 1982 SEIS satisfied the requirements of both NEPA and the district court's 1982 decision and order, and that passage of section 114 had rendered moot any issues remaining in the litigation. C.R. 494. In their opposition to the motion, appellants argued that dismissal was unwarranted because the stipulation required that the adequacy of the Third SEIS be litigated prior to dismissal of the action. C.R. 495.

■ The district court, in its Decision and Order of May 8, 1987, granted appellees' motion to dismiss, and terminated the injunctions in force. C.R. 507. The court held that the adequacy of the Final EIS had been determined by the court and that the issues in the lawsuit had all been resolved. Id. at 12. The court further held that "the formal reevaluation and subsequent preparation of the Third SEIS do not change the status of the Final EIS approved in 1982." Id.[12] The district court concluded that because appellees had complied with NEPA and the terms of the stipulation, and because the enactment of section 114 had rendered moot any issues based on section 4(f), there was no further need to enjoin construction of H–3.

We agree with the district court's reasoning. As discussed above, the district court

in 1982 had determined that the North Halawa Valley EIS was adequate except for its failure to discuss certain "new and significant" information which had arisen following circulation of the draft 1980 EIS. *Stop H–3 Ass'n v. Lewis*, 538 F.Supp. at 183–84. This court affirmed that determination in 1984. *Stop H–3 Ass'n v. Dole*, 740 F.2d at 1465. Appellees accordingly prepared a Second SEIS discussing the new information; FHWA approved the Second SEIS in September 1982. Appellants have never challenged the adequacy of the SEIS ordered by the district court in 1982. The district court, therefore, could correctly find that the 1982 EIS constituted a "final" and "adequate" EIS for the H–3 project, notwithstanding appellees' decision to prepare a Third SEIS.

■ Moreover, there is no authority for the proposition that the decision to prepare a Supplemental EIS after a Final EIS has been approved requires that work outside the area affected by the Supplemental EIS be halted. Appellants cite in their brief a number of cases which, they argue, constitute such authority. *See Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 531 F.2d 637 (2d Cir.1976); *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860 (5th Cir. 1975); *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927 (2d Cir.1974), *vacated and remanded*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *on remand*, 531 F.2d 637 (2d Cir.1976); *Sierra Club v. Stamm*, 507 F.2d 788, 793 (10th Cir.1974); *Citizens for Balanced Environment & Transportation, Inc. v. Volpe*, 503 F.2d 601 (2d Cir.1974), *cert. denied*, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975); *Sierra Club v. Callaway*, 499 F.2d 982, 990 (5th Cir.1974); *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 19 (8th Cir.1973); *Jones v. Lynn*, 477 F.2d 885 (1st Cir.1973); *Named Individual Members of San Antonio Conservation Society v. Texas High-*

---

12. The district court further stated that the Third SEIS, and any additional supplements which might be required as the H–3 project proceeds, are new matters outside the scope of the present lawsuit. C.R. 507 at 12. While the Third SEIS could thus not be challenged within this lawsuit, the district court made it clear that its decision did not foreclose appellants from challenging the adequacy of the Third SEIS in a separate action. Id.

*way Department*, 446 F.2d 1013 (5th Cir. 1971), *cert. denied*, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972); *Appalachian Mountain Club v. Brinegar*, 394 F.Supp. 105, 115 (D.N.H.1975); *Atchison, Topeka & Santa Fe Railway Co. v. Callaway*, 382 F.Supp. 610 (D.D.C.1974); *Movement Against Destruction v. Volpe*, 361 F.Supp. 1360, 1384 (D.Md.1973), *aff'd per curiam*, 500 F.2d 29 (4th Cir.1974); *James River v. Richmond Metropolitan Authority*, 359 F.Supp. 611, 635 (E.D.Va.1973), *aff'd*, 481 F.2d 1280 (4th Cir.1973); *Committee to Stop Route 7 v. Volpe*, 346 F.Supp. 731, 740 (D.Conn.1972). However, none of these cases present a situation where, as here, a Final EIS has already been prepared and approved. Instead, the cases cited by appellants all concern the appropriate scope of an *initial* EIS; the cases stand only for the proposition that a single project cannot be artificially subdivided into a number of separate projects for which separate EIS's may be prepared.[13] In this case, appellees have not attempted to segment the H–3 project into separate projects. Rather, appellees acknowledge that the H–3 project as a whole required approval of a Final EIS before construction could commence. They argue, correctly, that the 1982 EIS fulfilled this function.[14]

We hold that the district court correctly determined that FHWA's decision to prepare a Third Supplemental EIS did not deprive the 1982 EIS of its status as a Final EIS. Because the district court's approval of the 1982 EIS satisfied the requirement of the 1972 stipulation, and because NEPA permits work on those parts of a project unrelated to a Supplemental EIS to go forward when the project is already the subject of an adequate Final EIS, we affirm the district court's decision that neither NEPA nor the stipulation barred dissolution of the injunction and dismissal of the action.

## B. Spending Clause

Appellants argue that by exempting the H–3 project from the requirements of section 4(f), section 114 exceeds Congress' power under the Spending Clause of the Constitution.[15] Section 114 violates the Constitution, according to appellants, because the Spending Clause permits expenditures only for "national" purposes, yet the H–3 project, appellants argue, serves only "local" purposes.[16]

As support for their contention that the H–3 project is of "local" and not "national" significance, appellants point to the fact that the proposed highway is contained entirely within the state of Hawaii, and could only carry vehicles from one point in Hawaii to another. In addition, they note that a report issued in 1982 by the Congressional Budget Office (CBO) describes the highway as having "local" rather than "national" importance. Congressional Budget Office, *The Interstate Highway System: Issues and Options*, Table C–1 (June 1982).

---

**13.** *See, e.g., Named Individual Members of San Antonio Conservation Society*, 446 F.2d at 1023 (Secretary may not take a single project and divide it into "segments" for purposes of section 4(f) approval). *See also Atchison, Topeka & Santa Fe Railway Co.*, 382 F.Supp. at 620–21 (NEPA "requires that agencies of the Federal government consider the impact of an overall program and not just isolated aspects of facilities. A restricted impact analysis is prohibited because it 'would frustrate the vitality of NEPA by allowing piecemeal decisions.'") (citation omitted).

**14.** Appellants' contention that all construction on H–3 must cease pending approval of the Third EIS is further undercut by FHWA's regulations, which contemplate that work on a project may proceed while a supplement to a Final EIS is being prepared. *See* 23 C.F.R. 771.129(b) (1980) ("The decision to prepare a supplement to the FEIS shall not require withdrawal of the previous approvals for those aspects of the proposed action not directly affected by the changed conditions or new information.").

**15.** The Spending Clause provides in pertinent part:

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States....

U.S. CONST. art. I, § 8, cl. 1.

**16.** We construe appellants' claim as one asserting that section 114 does not serve the "general welfare" or "general public purposes." *See South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 2796, 97 L.Ed.2d 171 (1987).

In response, appellees argue, first, that section 114 does not represent an exercise of Congress' power under the Spending Clause because section 114 does not itself authorize the expenditure of funds. Thus, appellees imply, section 114 cannot violate the requirements of the Spending Clause. Second, appellees contend that even if section 114 were construed as an exercise of the spending power, the provision is a valid exercise of that power because the H–3 project is of "national" not "local" importance.

■ We find it unnecessary to decide whether section 114 is a spending measure, because it is clear that the H–3 project, whose construction section 114 mandates, is of national and not merely local importance and was intended to serve the general welfare. As the district court observed, H–3 is a part of an interstate highway system which serves important defense functions. Decision and Order, C.R. 507 at 5. Therefore, even if we were to accept appellants' characterization of section 114 as a spending measure, we would conclude that the provision falls comfortably within the scope of the spending power.

Congress has declared that prompt completion of the entire Interstate System is a matter of national importance. In the Federal–Aid Highway Act, Congress stated:

It is hereby declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense.

It is hereby declared that the prompt and early completion of the National System of Interstate and Defense Highways, so named because of its primary importance to the national defense and hereafter referred to as the "Interstate System", is essential to the national interest and is one of the most important objectives of this Act.

23 U.S.C. § 101(b)) (1988). Congress' explicit policy articulation demonstrates that completion of the entire interstate system, including construction of component highways either between or within individual states, is a matter of national importance.

As the district court correctly stated, the mere fact that H–3 is contained entirely within Hawaii does not negate the fact that it is part of a national system of highways. Decision and Order, C.R. 507 at 5.[17] Nor does the CBO's denomination of H–3 as a project of "local" importance supercede Congress' own statement, in section 101(b), that the Interstate System of which H–3 is a part is of national importance.

■ Finally, we believe that appellants' Spending Clause objection to section 114 is answered by the Supreme Court's directive in *Buckley v. Valeo:*

Appellants' "general welfare" contention erroneously treats the General Welfare Clause as a limitation upon congressional power. It is rather a grant of power, the scope of which is quite expansive, particularly in view of the enlargement of power by the Necessary and Proper Clause.... *It is for Congress to decide which expenditures will promote the general welfare.*

424 U.S. 1, 90, 96 S.Ct. 612, 668–69, 46 L.Ed.2d 659 (1976) (emphasis added). *See also South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 2796, 97 L.Ed.2d 171 (1987) ("In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress."). Be-

---

**17.** In an analogous context, the Supreme Court has held that legislation regulating the movement of commodities entirely within one state does not violate the Commerce Clause because Congress may conclude that the effect of consumption of products within one state affects interstate commerce. *See, e.g., Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942) ("[E]ven if appellee's activity be local ..., it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce...."). It should be noted that Congress, in section 101(b) of the Federal–Aid Highway Act, stated that the Interstate System was necessary not only for defense purposes but to "meet the needs of ... interstate commerce." 23 U.S.C. § 101(b).

cause Congress' statement in section 101(b) of the Federal–Aid Highways Act makes it clear that Congress considered completion of the Interstate System a matter of national importance, and because section 114 was enacted to expedite the System's completion, we must defer to Congress' determination that any spending to implement section 114 will promote the general welfare.

## C. Equal Protection

Appellants ask this court to hold that section 114 violates the equal protection component of the Fifth Amendment.[18] They argue, first, that legislation which is alleged to harm the environment should be subjected to heightened judicial scrutiny because the right to a healthy environment is an "important" individual right and because Congress violated constitutional principles of federalism in enacting a provision which, according to appellants, invidiously discriminates against citizens of Hawaii. According to appellants, we must strike down section 114 under heightened scrutiny because the statute is not substantially related to achievement of an important governmental purpose. Second, appellants contend that section 114 is constitutionally defective even when reviewed for rationality using minimum scrutiny, because it creates an arbitrary classification by denying residents of Hawaii the environmental protections provided by the 4(f) statutes.

The district court rejected appellants' arguments. The court observed, first, that no court has found that there is a fundamental right to a healthy environment. Decision and Order, C.R. 507 at 7. Therefore, heightened judicial scrutiny of section 114 was inappropriate. Next, the district court held that Congress had a rational basis for passage of section 114. The court stated:

> In addition to the rising costs of the [H–3] project over the past 14 years, Congress has the power to overturn judicial decisions which they feel are based on an interpretation of a statute [i.e., section 4(f)] inconsistent with the intent of Congress when the law was passed. That is what Congress has done here.

*Id.* at 7–8.

Appellants contend that the district court erred in applying the "rational basis" test to resolve their equal protection claim.[19] The court, according to appellants, should have employed an "intermediate" level of scrutiny[20] for two reasons. First, appellants argue that intermediate scrutiny of a statute affecting the environment is appropriate because such statutes impinge on the "important" individual right to a healthy environment. Section 114, appellants maintain, denies residents of Hawaii this right, and thereby violates their right to equal protection of the laws. Second, appellants contend that intermediate scrutiny of section 114 is required because the legislation rests on a distinction between citizens and non-citizens of Hawaii, a dis-

---

18. In *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the Supreme Court indicated that the Fifth Amendment's Due Process Clause, U.S. CONST. amend. V, subjects the federal government to constitutional limitations that are the equivalent of those imposed on the states by the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause commands that no state shall deny any person the equal protection of the laws. U.S. CONST. amend. XIV, § 1.

19. Appellants do not argue that "strict scrutiny" of section 114 is required by equal protection principles. Under strict scrutiny, the court treats as presumptively invidious those classifications that disadvantage a "suspect class," or that impinge upon the exercise of a "fundamental right." *Plyler v. Doe,* 457 U.S. 202, 216–17,

102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). Such classifictions will be upheld only if the classification has been precisely tailored to serve a compelling governmental interest. *Id.* at 217, 102 S.Ct. at 2395.

20. Intermediate scrutiny is the level of judicial review used to determine the validity of laws that classify according to gender and certain other criteria. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (alienage); *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (illegitimacy); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (gender). A law will be struck down under intermediate scrutiny unless it can be shown that it is substantially related to achievement of an important governmental purpose. *Id.* at 197, 97 S.Ct. at 456–57.

tinction which violates the constitutional principle of federalism.

Intermediate scrutiny is only employed when "concerns sufficiently absolute and enduring can be clearly ascertained from the Constitution and [Supreme Court] cases...." *Plyler v. Doe*, 457 U.S. at 218 n. 16, 102 S.Ct. at 2395 n. 16. Appellants argue that their interest in having a "clean and healthful environment" rises to this level. Appellants concede that no court has yet found that preservation of a healthy environment constitutes a concern of constitutional magnitude deserving heightened judicial scrutiny in the context of equal protection challenges to legislation alleged to degrade the environment.[21] They nonetheless argue, with some force, that the right to a healthy environment is one this court should recognize because of its great importance to the well-being of all persons.

We agree that it is difficult to conceive of a more absolute and enduring concern than the preservation and, increasingly, the restoration of a decent and livable environment. Human life, itself a fundamental right, will vanish if we continue our heedless exploitation of this planet's natural resources. The centrality of the environment to all of our undertakings gives individuals a vital stake in maintaining its integrity.

■ However, we need not decide here whether the importance of a healthful environment gives rise to a right of constitutional magnitude. Even assuming, arguendo, that enjoyment of a healthful environment is an important right for purposes of equal protection analysis, section 114 satisfies the requirements for validation of legislation under the intermediate level of scrutiny appellants urge this court to apply.

First of all, we have found no authority forbidding Congress in all instances from carving out a local exception to a national policy. To the contrary, many decisions approve such action. *See, e.g., Friends of the Earth v. Weinberger*, 562 F.Supp. 265, 270 (D.D.C.1983), *appeal dismissed without opinion*, 725 F.2d 125 (D.C.Cir.1984) ("Jackson amendment" exempting Executive branch report on how MX missiles were to be based from NEPA requirements); *Sequoyah v. TVA*, 480 F.Supp. 608 (E.D.Tenn.1979), *aff'd*, 620 F.2d 1159 (6th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980) (provision of Energy and Water Development Act authorizing Tennessee Valley Authority to impound Tellico River notwithstanding requirements of Endangered Species Act or "any other law"). In *Sequoyah v. TVA*, the court stated that "[t]here is no question ... that Congress has the power to make exceptions to rights it or state legislatures have created by statute, as long as such exceptions are not invidiously discriminatory." 480 F.Supp. at 610–11. Finding nothing invidiously discriminatory in Congress' decision to exempt the Tellico Dam project from otherwise applicable legal requirements, the *Sequoyah* court rejected plaintiffs' equal protection argument. *Id.* at 612.

Appellants argue that this case, unlike *Sequoyah*, presents an example of "invidiously discriminatory" legislation. They

---

**21.** Appellants correctly observe, however, that a number of Supreme Court decisions recognize the importance of a healthy environment. *See, e.g., United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (users of environmental resources such as parks have legally cognizable interests in those resources sufficient to establish standing to challenge governmental activity affecting them). *See also Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

In addition, several district court opinions appear to anticipate eventual recognition of a constitutional right to a healthful environment. *See, e.g., In re Agent Orange Product Liability Litigation*, 475 F.Supp. 928, 934 (E.D.N.Y.1979) ("Since there is not yet a constitutional right to a healthful environment...."); *Township of Long Beach v. New York*, 445 F.Supp. 1203, 1212–13 (D.N.J.1978) ("Although such a legal theory may be appealing it is not 'desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant.'") (citation omitted).

contend that in enacting section 114 Congress singled out Hawaii and its citizens for unique and onerous treatment. According to appellants, the "legislative classification" embodied in section 114 is between the entire population of Hawaii, whose interaction with and enjoyment of the environment will be diminished by H–3, and all other United States citizens. This alleged imposition on citizens of Hawaii of a disadvantage not shared by citizens of the other states, appellants maintain, invidiously discriminates against Hawaiians based on their state citizenship in violation of the constitutional principle of federalism. Federalism principles, as appellants point out, forbid the federal government from treating any state as the inferior of any other state, regardless of its order of entry into the Union. Appellants contend that section 114 has precisely this effect, because it allegedly subjects Hawaii and its citizens to a burden which no other state must bear. Appellants conclude that this court should strike down section 114 because the statute imposes hardships on a group whose membership is determined by reference to a classification, state citizenship, which undermines federalism's precept that all states in the federal Union stand on an equal footing.

We do not accept appellants' analysis. First, section 114 does not, as appellants believe, rest on a legislative distinction between Hawaii and the other 49 states. Section 114 by its terms refers *only* to the H–3 project. The statute does not exempt all federal highway construction projects in Hawaii from the requirements of section 4(f); rather, it exempts one project located in Hawaii from the 4(f) statutes. Even when we look beyond its terms to its effect, section 114 does not affect the state of Hawaii as a whole, to the exclusion of the rest of the nation. Instead, the effects of section 114 will be felt by any United States citizen whose use and enjoyment of Hawaii's environment is affected by H–3, regardless of that person's state of residence. Thus in depicting citizens of Hawaii as a disadvantaged "class" for purposes of equal protection analysis, appellants include people who will not be affected by

construction of H–3, and overlook others who will. In short, it cannot be said that section 114 rests on a state-based classification simply because it refers to a project located in Hawaii.

■ Even if we were to accept appellants' contention that section 114 creates a legislative classification which subjects citizens of Hawaii to treatment different from that accorded to citizens of the other states, we could not conclude that the statute invidiously discriminates against citizens of Hawaii in violation of the principles of federalism. Contrary to appellants' assertion, it is simply not true that Congress may not create exemptions from generally applicable statutes in order to authorize state-specific projects. *See, e.g.,* Trans–Alaska Pipeline Authorization Act, Pub.L. 93–153, 87 Stat. 576 (amending the Mineral Lands Leasing Act, 30 U.S.C. § 185 [1970 ed.], to overcome that Act's width limitation for pipelines and thereby permit construction of the Trans–Alaska Pipeline). *See also Izaak Walton League of America v. Marsh,* 655 F.2d 346, 367 (D.C.Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).

■ We note, also, that appellants have not alleged that Congress was motivated by discriminatory animus against Hawaii or its citizens when it enacted section 114. Nor is there any evidence in the record that Congress intended to harm the people of Hawaii by exempting the H–3 project from the 4(f) statutes. To the contrary, there is evidence that Congress was partly motivated by its belief that the highway would benefit Hawaii. *See* H.R.Rep. No. 99–1005, 99th Cong., 2d Sess. 784 (1986) ("The conferees also take note of the fact that H–3 has been the subject of litigation for more than 14 years. During that time, ... the people of Hawaii have been deprived of a much needed highway."). The Supreme Court has stated, in the context of claims of gender discrimination, that while the disparate impact of a facially neutral statute provides the "starting point" for review, "purposeful discrimination is 'the condition that offends the Constitution.' " *Personnel Adm'r of Massachusetts v. Fee-*

*ney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979). Discriminatory purpose, the Court explained, implies more than an awareness of consequences. *Id.* at 279, 99 S.Ct. at 2296. "It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Appellants' allegations would have to meet this standard in order to establish an equal protection violation because section 114 does not on its face refer to the state or people of Hawaii, and because appellants argue that their claim should receive the same level of judicial scrutiny as would a claim of gender discrimination. Because appellants have neither alleged nor shown that section 114 reflects a purpose to discriminate on the basis of state citizenship, we conclude that section 114 does not invidiously discriminate against appellants on the basis of state citizenship.

██ Second, there is authority to support Congress' ability to moot a pending controversy by enacting new legislation. *See Friends of the Earth v. Weinberger,* 562 F.Supp. at 270 ("Through the passage of legislation which governs the lawsuit, Congress can effectively moot a controversy notwithstanding its pendency before the courts."). There is thus, by itself, nothing illegitimate about a decision to enact legislation exempting a particular project, the subject of pending litigation, from the requirements of existing statutes.

██ Third, we hold that section 114 is substantially related to the achievement of important governmental purposes. *See Craig v. Boren,* 429 U.S. at 197, 97 S.Ct. at 457. Congress explained the purposes of section 114 in the Committee Report written to accompany the statute. The Committee Report states that section 114 was designed to overturn this court's reading of section 4(f) in *Stop H–3 Ass'n v. Dole,* 740 F.2d 1442 (9th Cir 1984), *cert. denied,* 471

U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). The Conference Committee explained:

> In reaching its decision, the [Ninth Circuit] relied on a highly technical reading of Section 4(f) of the Department of Transportation Act, designed to protect publicly owned parkland. In reality, no land from the park involved (Ho'omaluhia Park) has been, nor will be, taken or used by the highway. Indeed, the highway was planned and designed in conjunction with the park, and the park boundary was expanded to make use of the highway as a buffer zone that would forestall urban development around the park. Were it not for the extensive efforts of the State of Hawaii's highway planners, the park would not even exist. Section 4(f) was never intended to block the construction of a highway the design of which was specifically tailored to afford such special protection of the parklands.

H.R.Rep. No. 99–1005, 99th Cong., 2d Sess. 784 (1986). When it enacted section 114 Congress was therefore concerned with this court's "technical" interpretation of section 4(f), as well as with the length of the litigation, and the need of the people of Hawaii for a highway. H.R.Rep. No. 99–1005, 99th Cong., 2d Sess. 784 (1986). Moreover, the H–3 project, as part of the Defense Interstate Highway System, serves an important national defense role. *See supra* III B. Finally, there is little doubt that section 114 is substantially related to the achievement of Congress' purpose of expediting completion of H–3. By exempting the H–3 project from further 4(f) compliance, Congress clearly eliminates future delays in H–3's construction. We therefore conclude that section 114 does not violate appellants' equal protection rights because the statute is substantially related to the achievement of important governmental purposes.[22]

---

22. Because section 114 would survive the intermediate level of equal protection scrutiny, it would a fortiorari be upheld under rationality review. Rationality review has two steps. First, the court "must determine whether the

challenged legislation has a legitimate purpose." *Jackson Water Works v. Pub. Utils. Comm'n,* 793 F.2d 1090, 1094 (9th Cir.1986), *cert. denied,* 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 184 (1987). Second, if the purpose is legitimate, the court

### D. Separation of Powers

Appellants contend that in enacting section 114, Congress usurped the Executive branch's authority to execute the laws, thus violating the constitutional principle of the separation of powers among the three branches of the federal government. According to appellants, section 114 represents an attempt by Congress to control the Secretary's execution of the 4(f) statutes, by imposing upon the Secretary, Congress' own determination that section 4(f)'s requirements have been satisfied. Appellants also argue that enactment of section 114 amounted to performance of a judicial function, also in violation of the separation of powers.

The district court rejected appellants' separation of powers claim. The court observed that "[t]his is not a case where Congress has sought to 'aggrandize itself at the expense of the other two branches.'" Decision and Order, C.R. 507 at 9 (quoting *Buckley v. Valeo*, 424 U.S. 1, 129, 96 S.Ct. 612, 687, 46 L.Ed.2d 659 (1976)). Rather, the court found, "Congress has enacted superseding legislation." *Id.* For the reasons discussed below, we agree with the district court's conclusion.

### 1. *"Execution" of the Law*

Under section 4(f), the Secretary must determine whether there is a "feasible and prudent alternative" to the use of parkland, and whether a program or project "includes all possible planning to minimize harm to such park...." 49 U.S.C. § 303; 23 U.S.C. § 138. In making these determinations, the Secretary "executes" the 4(f) statutes. *See Bowsher v. Synar*, 478 U.S. 714, 733, 106 S.Ct. 3181, 3192, 92 L.Ed.2d 583 (1986) (exercise of judgment concerning facts that affect application of statute constitutes execution of the law). Appellants argue that section 114 represents Congress' usurpation of the executive function of making these determinations. By ordering the Secretary to approve construction of H-3, they contend, Congress attempted

to direct the Secretary's exercise of discretion pursuant to section 4(f).

Appellants point to the Conference Committee Report accompanying section 114 to support their argument. The Report states:

Additional studies and modifications that have been proposed would not result in any additional protection for the park and may, indeed, prove harmful. Other alternatives available for the highway are not prudent and/or feasible because they are either one or more of the following: (1) unsafe, (2) environmentally damaging, (3) much more expensive, or (4) unduly disruptive and costly to the local communities. Accordingly, the conferees find that there is no feasible and prudent alternative to the Common Boundary alignment for Interstate H-3 identified in the EIS/Section 4(f) statements previously approved by the Secretary of Transportation.

\*     \*     \*     \*     \*     \*

This section therefore directs the Secretary of Transportation to approve the construction of the remaining 10.7 mile segment of H-3 in the location currently planned without administrative review pursuant to Section 4(f) of the Department of Transportation Act and further directs that such construction shall proceed to completion.

H.R.Rep. No. 1005, 99th Cong., 2d Sess. 784, 785 (1986). Appellants argue that the Conference Committee's Report demonstrates that Congress impermissibly attempted to interpret and execute the law, namely the 4(f) statutes, by enacting section 114. The Report, they say, reveals that the conferees conducted their own "administrative" review of the H-3 project, and in section 114 ordered the Secretary to accept their "findings." In so doing, appellants contend, Congress preempted an executive function.

---

"must decide whether the challenged classification promotes that purpose." *Id.* If the statute fails to satisfy either requirement, it must be struck down. As our discussion above indi-

cates, we have concluded that section 114 serves legitimate and important governmental purposes, and is rationally and substantially related to the achievement of those purposes.

■ It is true, as appellants observe, that "[t]he structure of the Constitution does not permit Congress to execute the laws...." *Bowsher v. Synar*, 478 U.S. 714, 726, 106 S.Ct. 3181, 3188–89, 92 L.Ed. 2d 583 (1986). The Supreme Court has stated that "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Id.* at 733, 106 S.Ct. at 3192. We do not believe, however, that enactment of legislation exempting a project from statutory requirements constitutes "execution" of the law as described in *Bowsher.* In the instant case, section 114 cannot be said to "interpret" section 4(f). Section 114 does not interpret section 4(f)'s requirements but rather exempts H-3 from them, making section 4(f) irrelevant for purposes of the Secretary's decision to approve construction of H-3.

Nor did Congress impose 4(f) "findings" upon the Secretary. Although the conferees chose to provide a factual basis for the decision to enact section 114, the "findings" set out in their Report do not transform the legislative enactment of section 114 into an "executive" act. We conclude, therefore, that Congress did not attempt to perform an executive function when it enacted section 114.

### 2. *The Constitution's Requirements for Legislation*

Our conclusion that Congress did not intrude upon the authority of the other branches finds support in the Supreme Court's recent discussions of the separation of powers doctrine. *See, e.g., Mistretta v. United States,* — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); *Morrison v. Olson,* — U.S. —, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In *Chadha,* the Supreme Court struck down a one house "legislative veto" provision by which

each House of Congress retained the power to reverse a decision Congress had expressly authorized the Attorney General to make. The Court stated:

> Disagreement with the Attorney General's decision on Chadha's deportation— that is, Congress' decision to deport Chadha—no less than Congress' original choice to delegate to the Attorney General the authority to make that decision, involves determinations of policy that Congress can implement in only one way; bicameral passage followed by presentment to the President. Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked.

462 U.S. at 954–55, 103 S.Ct. at 2785–86. In *Chadha,* as here, the legislative history suggested that Congress based its policy decision upon a "finding" stemming from its own application of statutory standards to the relevant facts. *Id.* at 926, 103 S.Ct. at 2771.[23] In both cases, moreover, Congress' policy decision was embodied in an "action that had the purpose and effect of altering the legal rights, duties and relations of persons, including [private parties and Executive branch officials], all outside the Legislative Branch." *Id.* at 952, 103 S.Ct. at 2784–85 (defining "legislative" action). The crucial difference between *Chadha* and the present case, however, is that in *Chadha* Congress attempted to implement its policy determination without satisfying the constitutional prerequisites for valid legislative action: bicameral passage and presentment to the President. *Id.* at 958, 103 S.Ct. at 2787–88; U.S. CONST. art. I, § 7. It was for this reason that the Court struck down the one House legislative veto provision and barred Chadha's deportation. *Chadha,* 462 U.S. at 958–59, 103 S.Ct. at 2787–88. Here, by contrast, it is undisputed that both Houses of Congress passed section 114 and that the legislation was signed by the President. In contrast to the situation disapproved by the

---

**23.** The Court observed in *Chadha* that when the House was considering Chadha's deportation, Representative Eilberg stated from the floor that the House Committee on the Judiciary had reviewed 340 immigration cases and concluded

that Chadha and five other persons did not meet the statutory requirements for suspension of deportation, a conclusion contrary to that previously reached by the Attorney General. 462 .U.S. at 926, 103 S.Ct. at 2771.

Court in *Chadha*, Congress here complied with the constitutional requirements for legislative enactments.[24]

■ Moreover, even if we were to accept appellants' argument that section 114 represents an attempt by Congress to control the Executive branch's execution of the 4(f) statutes with respect to H–3, we still could not conclude that Congress violated the separation of powers. Simply put, Congress may change its mind, so long as it complies with the Constitution's requirements for action that alters the delegation of authority to the Executive branch. Thus in *Chadha* the Court observed that once the Attorney General had exercised his legislatively delegated authority to determine that an alien should be permitted to remain in the United States, Congress could only achieve the deportation of that alien, if at all,[25] "by legislation requiring deportation." *Id.* at 952–54, 103 S.Ct. at 2784–86. Similarly, one House of Congress could not have passed a resolution reversing a determination by the Secretary that the 4(f) requirements had not been satisfied and that construction of H–3 could therefore not proceed; yet Congress could achieve construction of H–3 notwithstanding the 4(f) statutes by legislation ordering the Secretary to approve the project.

The Supreme Court's opinion in *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), provides further support for our conclusion. In *Bowsher*, the Court invalidated the reporting provisions of the Balanced Budget and Emergency Deficit Control Act (the Act) because the provisions conferred executive functions upon the Comptroller General, an officer removable by Congress. The Court observed that under section 251 of the Act, the Comptroller General was required to exercise judgment concerning facts that affect the application of the Act, to interpret the provisions of the Act, and to determine precisely what budgetary calculations were required. 478 U.S. at 733, 106 S.Ct. at 3192. As the Court noted, decisions of this kind "are typically made by officers charged with executing a statute." *Id.* *See also id.* (discussing executive nature of Comptroller General's functions under section 252 of the Act). The Court invalidated these provisions, holding that "once Congress makes its choice in enacting legislation its participation ends. *Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation.*" *Id.* (citing *Chadha*, 462 U.S. at 958, 103 S.Ct. at 2787–88) (emphasis added).

Thus the infirmity of the statutory provisions struck down in *Bowsher* was not their attempt to direct the execution of the law, but rather the manner in which they attempted to do so. Congress could not, the Court held, invest an officer subject to removal only at the initiative of Congress with the authority to execute the Act. *Id.* at 734, 106 S.Ct. at 3192–93. Had Congress wished, however, it could have passed new legislation controlling the Executive branch's execution of the Act. *See id.*

Therefore if, as appellants argue, Congress in enacting section 114 controlled the Executive branch's execution of the 4(f) statutes, it did so precisely in the manner

---

**24.** Appellants argue, nonetheless, that because Congress has never amended or repealed the 4(f) statutes, its delegation of authority to the Secretary to make the findings required by section 4(f) has not been "legislatively altered or revoked." *Chadha*, 462 U.S. at 955, 103 S.Ct. at 2786. This argument ignores the fact that section 114 is itself legislation which alters the delegation of authority to the Secretary contained in section 4(f). *See id.* Appellants have not presented, and we have not found, any authority forbidding Congress to alter a legislative grant of authority by means of new legislation directed at a particular project.

**25.** The Court stated:

Without the provision for one-House veto, Congress would presumably retain the power, during the time allotted in § 244(c)(2), to enact a law, in accordance with the requirements of Art. I of the Constitution, mandating a particular alien's deportation, unless, of course, other constitutional principles place substantive limitations on such action.

*Chadha*, 462 U.S. at 935 n. 8, 103 S.Ct. at 2776 n. 8. As our discussion of appellants' Spending Clause and equal protection claims demonstrates, no "other constitutional principles" limiting Congressional action are present in this case.

the Court approved in *Chadha* and *Bowsher:* passage by a majority of both Houses and presentment to the President. In so doing, Congress acted in accordance with the constitutional constraints on governmental action recognized in the doctrine of separation of powers. The requirements of bicameral passage and presentment (together with the veto power and Congress' power to override a veto) "were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps." *Chadha*, 462 U.S. at 957, 103 S.Ct. at 2787. By adhering to these requirements, Congress avoids the possibility of legislative encroachment on the powers of the other branches, a possibility the Framers foresaw and attempted to forestall by "making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution." *Id.* at 959, 103 S.Ct. at 2788.

### 3. *Disruption of Coordinate Branches' Functions*

A court's separation of powers inquiry is not ended when it determines that the challenged Branch acted in a constitutionally prescribed manner. Even where Congress has complied with the requirements of bicameral passage and presentment, a statute may still pose a potential for disruption of the functioning of a coordinate Branch. In such a case, a court must ask to what extent the contested law "prevents the Executive [or Judicial] Branch from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). *See also* Krent, *Separating the Strands in Separation of Powers Controversies*, 74 Va.L. Rev. 1253, 1257 (1988). In *Nixon*, the Court was asked to decide whether Congress, in enacting the Presidential Recording and Materials Preservation Act, unduly intruded upon the President's prerogatives by asserting limited control over presidential papers. The President, who brought the challenge, argued that the Act would chill the candor of Presidents and their advisors. Addressing the competing claims of Congress and the President, the Court stated:

> [I]n determining ... the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which [the contested law] prevents the Executive Branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

*Id.* at 443, 97 S.Ct. at 2790 (citation omitted). The Court upheld the Act, concluding that it posed no realistic threat of disruption to the Executive branch. *Id.* at 443–46, 97 S.Ct. at 2790–92.

The Court articulated a similar standard in *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). In that case, the Court was faced with the question whether the Commodity Futures Trading Commission (CFTC), an agency within the Executive branch, could adjudicate in reparation proceedings counterclaims arising under state law. Regulations implementing section 74 of the Commodity Exchange Act authorized brokers to raise in reparation proceedings brought by their customers any counterclaims arising out of the same events set forth in the customer's complaint. The challenge to the Act, brought by a commodity broker's customer, rested on the potential for dilution of federal judicial power resulting from the adjudication of common law claims by administrative tribunals. In *Schor*, the Court framed the separation of powers inquiry as follows:

> [I]n reviewing Article III challenges, we have weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary.... Among the factors upon which we have focused are the extent to which the "essential attributes of judicial power" are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises

the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III.

478 U.S. at 851, 106 S.Ct. at 3757–58 (citation omitted). The Court upheld the challenged provisions, having concluded that "the congressional authorization of limited CFTC jurisdiction over a narrow class of common law claims as an incident to the CFTC's primary, and unchallenged, adjudicative function does not create a substantial threat to the separation of powers." *Id.* at 854, 106 S.Ct. at 3259–60.

In *Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 2597, 2619, 101 L.Ed.2d 569 (1988), the Supreme Court upheld the Ethics in Government Act's provision for appointment of independent counsel against separation of powers challenge because it did not "impede the President's ability to perform his constitutional duty" or "unduly trammel[ ] on executive authority." Even though the Act "reduces the amount of control or supervision that the Attorney General and, through him, the President exercises over the investigation and prosecution of a certain class of alleged criminal activity," *id.* 108 S.Ct. at 2621, the Court concluded that it did not " 'impermissibly undermine[ ]' the powers of the Executive Branch, ... or 'disrupt[ ] the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions.' " *Id.* (quoting *Schor,* 478 U.S.

at 856, 106 S.Ct. at 3260–61; *Nixon,* 433 U.S. at 443, 97 S.Ct. at 2790.)

Applying the reasoning of these opinions to this case, we do not believe that section 114 threatens to disrupt the functioning of either the Executive or Judicial branches. Section 114 does not, contrary to appellants' contention, deprive the Executive branch of its authority to execute the 4(f) statutes. Congress has not reserved to itself the power to execute section 4(f), but rather has left that power with the Executive branch. As we have explained, section 114 exempts the H–3 project from section 4(f)'s requirements, leaving nothing for the Executive branch legally to "execute" with respect to H–3. Yet section 114 does not abridge the Executive branch's authority to execute the 4(f) statutes in all instances in which it applies. It is fully within Congress' prerogative legislatively to alter the reach of the laws it passes, assuming no constitutional principles are thereby violated. *See Chadha,* 462 U.S. at 935 n. 8, 103 S.Ct. at 2776 n. 8.

Nor does section 114 deprive the courts of any of the "essential attributes of judicial power." *Schor,* 478 U.S. at 851, 106 S.Ct. at 3757–58. Section 114 does not, as appellants argue, strip the courts of jurisdiction over claims of noncompliance with section 4(f).[26] Rather, it withdraws the protections of the 4(f) statutes from one project. No other Branch or agency is given jurisdiction of claims that the courts otherwise would decide, as in *Schor,* instead, the courts retain jurisdiction to review Executive branch compliance with sec-

---

**26.** This is not a case in which Congress has enacted a statute which bars judicial review of agency or Executive branch actions. *See Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). Nor is this a case in which Congress has passed a law providing that, upon proof of certain facts, a court must summarily dismiss for want of jurisdiction a pending claim based on a federal statute. *See United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871) (invalidating, as violative of separation of powers, statute depriving courts of jurisdiction over pending claims for recovery of property upon proof that claimant received Presidential pardon for giving aid to the Confederacy). *See also Battaglia v. Gen-*

*eral Motors Corp.,* 169 F.2d 254, 257 (2d Cir.), *cert. denied,* 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948) ("while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take private property without just compensation."). Therefore, "[a]lthough there is no definitive answer to the question whether there are constitutional restraints when Congress seeks to limit the jurisdiction of all federal courts, we need not address that question here." *Bartlett v. Bowen,* 816 F.2d 695, 706 (D.C.Cir.1987) (emphasis deleted).

**1438**

tion 4(f) wherever that statute applies.[27] Nor did Congress perform a "judicial" function in exempting H-3 from section 4(f). Congress, in enacting laws, may rest its policy decisions on "factual" determinations, including determinations concerning the relationship of facts to preexisting law. Thus the Conference Committee's expression of its view that the H-3 project satisfied the requirements of the 4(f) statutes, H.R.Rep. No. 1005, 99th Cong., 2d Sess. 784 (1986), does not represent "adjudication" by Congress but rather the legitimate result of investigation and analysis upon which legislative decisions are based.

### IV. CONCLUSION

We AFFIRM the district court's dismissal of the action, and AFFIRM its lifting of the preliminary injunction.

---

**27.** As we have discussed above, we have found no authority forbidding Congress from exempting a project which is the subject of pending litigation from the requirements of the statute which the project is alleged to violate. *See supra* III C.