**F I L E D**
United States Court of Appeals
Tenth Circuit

**FEB 4 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

BIODIVERSITY ASSOCIATES and
BRIAN BRADEMEYER,

Plaintiffs-Appellants,

SIERRA CLUB and THE
WILDERNESS SOCIETY,

Plaintiffs,

v.

No. 03-1002

RICK D. CABLES, in his official
capacity as Regional Forester of the
Rocky Mountain Region of the U.S.
Forest Service; DALE N.
BOSWORTH, in his official capacity
as Chief of the U.S. Forest Service;
JOHN C. TWISS, in his official
capacity as Supervisor of the Black
Hills National Forest; U.S. FOREST
SERVICE,

Defendants-Appellees,

LARRY GABRIEL, in his official
capacity as Secretary of the South
Dakota Department of Agriculture;
BLACK HILLS REGIONAL
MULTIPLE USE COALITION;
BLACK HILLS FOREST RESOURCE
ASSOCIATION; MEADE COUNTY,
LAWRENCE COUNTY, and
PENNINGTON COUNTY, all political
subdivisions the State of South
Dakota, *

    Defendants-Intervenors-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 99-N-2173)**

---

Ray Vaughn of WildLaw, Montgomery, Alabama (Steve Novak of WildLaw, Asheville, North Carolina, with him on the briefs), for Plaintiffs-Appellants.

Kevin Traskos, Assistant United States Attorney (John W. Suthers, United States Attorney, with him on the brief), Denver, Colorado, for Defendants-Appellees.

Diane Best, Assistant Attorney General (Lawrence E. Long, Attorney General; Charles D. McGuigan, Assistant Attorney General, with her on the brief), State of South Dakota, Pierre, South Dakota, for Defendants-Intervenors-Appellees.

---

Before **MURPHY** , Circuit Judge, **BRORBY** , Senior Circuit Judge, and **McCONNELL** , Circuit Judge.

---

    *Mr. Cables, Mr. Bosworth and Mr. Gabriel, who are the successors in office of Lyle K. Laverty, Michael Dombeck and Darrell Cruea, respectively, have been substituted as parties pursuant to Fed. R. App. 34(c)(2).

**McCONNELL** , Circuit Judge.

For many years, Congress has been unable to come to agreement on nationwide legislation to address the dangers of insect infestation and fire in the national forests. In 2002, however, in a rider to a supplemental appropriations act for the war on terrorism, Congress passed legislation applicable to selected sections of the Black Hills National Forest in South Dakota and nowhere else, permitting logging and other clearance measures as a means of averting forest fires. The legislation specifies forest management techniques for these lands in minute detail, overrides otherwise applicable environmental laws and attendant administrative review procedures, and explicitly supersedes a settlement agreement between the Forest Service and various environmental groups regarding management of these lands.

The question presented is whether the extraordinary specificity of this legislation, coupled with its displacement of a settlement agreement, amounts to congressional violation of the Constitution's separation of powers, by invading the province of the executive branch, the judicial branch, or both. We hold that it does not. Article IV, § 3, cl. 2 expressly grants Congress "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." With respect to this power – like most

of its enumerated powers – Congress is permitted to be as specific as it deems appropriate. Moreover, settlement agreements between private litigants and the executive branch cannot divest Congress of its constitutionally vested authority to legislate.

BACKGROUND

The first law involved in this case is the law of unintended consequences. Fire suppression efforts conducted over more than a century in large parts of the West have had the unintended effect of transforming forests from savannah-like grasslands studded with well-spaced large, old, fire-resistant trees, into thicker, denser forests. [1] Prior to the arrival of Europeans, these forests experienced frequent, but relatively mild, forest fires caused primarily by lightning and Native American activity. [2] These fires would clear the forest floor of undergrowth and

---

[1] *See* Robert B. Keiter, *Keeping Faith with Nature: Ecosystems, Democracy, and America's Public Lands* 136, 140-41, 155 (2003); Marlin A. Johnson, *Changed Southwestern Forests: Resource Effects and Management Remedies*, *at* <http://www.cpluhna.nau.edu/Research/changed_southwestern_ forests.htm> (last visited Dec. 23, 2003); W. Wallace Covington et al., *Restoring Ecosystem Health in Ponderosa Pine Forests of the Southwest*, 95 *Journal of Forestry*, April 1997, 23, 23, 27 tbl.1, *corrected adaptation available at* <http://www.cpluhna.nau.edu/Research/pinerestoration.htm> (last visited Dec. 23, 2003); *see generally* Robert E. Keane et al., *Cascading Effects of Fire Exclusion in Rocky Mountain Ecosystems: A Literature Review* (U.S. Forest Serv. Gen. Technical Report RMRS-91, 2002).

[2] Researchers have found that pre-European human inhabitants of North America used fire and other techniques to alter the "natural" character of the

(continued...)

saplings while leaving the larger trees unscathed. The denser forests produced by

fire suppression accumulate more combustible fuel and are more vulnerable to

infestations, such as mountain pine beetles, and to fires far more intense and

devastating than those of the pre-settlement era. [3] Forestry experts are divided as

[2](...continued)
forests. *See* Keiter, *supra* note 1, at 136 & 376-77 n.15; Stephen J. Pyne, *A Cultural History of Wildland and Rural Fire* 46-50, 66-83 (1982); Homer Aschmann, *Aboriginal Use of Fire*, in *Proceedings of the Symposium on the Environmental Consequences of Fire and Fuel Management in Mediterranean Ecosystems* 132, 133, 135, 137-38 (Harold A. Mooney & C. Eugene Conrad technical coordinators, U.S. Forest Serv. Gen. Technical Report WO-3, 1977); George E. Gruell, *Indian Fires in the Interior West: A Widespread Influence*, in *Proceedings of the Symposium and Workshop on Wilderness Fire* 68 (James E. Lotan et al. technical coordinators, U.S. Forest Serv. Gen. Technical Report INT-182, 1985); Henry T. Lewis, *Why Indians Burned: Specifics Versus General Reasons*, in *id.* 75.

Some speculate that before the arrival of the ancestors of Native Americans on this continent, forests were denser, and that it was the Native Americans' deployment of fire that created the savannah-like forests that European explorers encountered and that are now deemed "natural." *See, e.g.*, Pyne, *supra*, at 79 ("[T]he general consequence of the Indian occupation of the New World was to replace forested land with grassland or savannah, or, where the forest persisted, to open it up and free it from underbrush."); Nancy Langston, *Forest Dreams, Forest Nightmares: The Paradox of Old Growth in the Inland West* 46-48 (1995) (agreeing that Native American fires helped to open up the forest, but denying that they were primarily responsible for creating the grasslands). *But see, e.g.*, Thomas W. Swetnam & Christopher H. Baisan, *Historical Fire Regime Patterns in the Southwestern United States since AD 1700*, in *Proceedings of the Second La Mesa Fire Symposium* 11, 29 (C.D. Allen ed., U.S. Forest Serv. Gen. Technical Report RM-286, 1996) (arguing that because fuels and climatic conditions controlled the extent of forest fires more than ignition sources did, Native American activity in the Southwest did not significantly alter preexisting fire patterns).

[3]*See* Keane et al., *supra* note 1, at 14-15; Keiter*, supra* note 1, at 141;

(continued...)

to the response to these conditions. Some advocate a hands-off approach, allowing fire (outside areas of human habitation) to reconstitute the forests in their natural state; some advocate controlled burns; and some advocate thinning and fuel removal. [4] The role of commercial logging as part of the last approach has been particularly controversial.

From 1983 to 1997, the Beaver Park Roadless Area, a relatively pristine portion of the Black Hills National Forest, was free of logging activity, apparently because the land management plan then in place did not allow it. In 1997, however, the Forest Service approved a new Black Hills National Forest plan revision (the "1997 Revised Plan"), which allowed logging in a significant

_____

[3](...continued)
Langston, *supra* note 2, at 296-97.

[4]Keiter, *supra* note 1, at 141 & 378 n.27. *Compare* Michael Axline, *Forest Health and the Politics of Expediency*, 26 Envtl. L. 613, 626-39 (1996) (arguing that there is no forest health emergency because fire and insect infestation are natural parts of forest ecology, and dismissing tree-thinning measures as motivated by logging interests), *with* James K. Agee, *Alternatives for Implementing Fire Policy*, in *Proceedings: Symposium on Fire in Wilderness and Park Mangement* 107, 108-111 (James K. Brown et al. technical coordinators, U.S. Forest Serv. Gen. Technical Report INT-320, 1995) (warning that given the current unnatural forest densities, it would be foolish to rely on natural fires without prescribed burns to reproduce natural forest ecosystems), *and with* Covington et al., *supra* note 1, at 24-25 (noting that because prescribed burns are difficult to control and unpredictable in their results, they must be supplemented by tree thinning and deadwood removal); Johnson, *supra* note 1 (recommending a mixed strategy using natural fires, prescribed burns, and tree thinning). *See also* Langston, *supra* note 2, at 260-63 (expressing doubt about the possibility of successfully engineering a return to the old forests by any method).

portion of Beaver Park's 5,109 acres. It subsequently began preparations for a timber sale in an area called the "Veteran/Boulder Project Area," which included most of the Beaver Park land newly authorized for logging. Especially in a part of the area known as Forbes Gulch, a major purpose of the logging was to counter an infestation of mountain pine beetles. The Forest Service proceeded to clear various administrative hurdles in preparation for the Veteran/Boulder timber sale, issuing a final environmental impact statement on the proposed sale and records of decision approving timber harvest both inside and outside the Beaver Park Roadless Area.

Several environmental groups, including the Sierra Club, the Wilderness Society, and Appellant Biodiversity Conservation Alliance (BCA),[5] objected strenuously to the timber sale. The Beaver Park Roadless Area was one of the last areas in the Black Hills National Forest still eligible for designation as a wilderness, and logging activity would likely disqualify it from being designated as such.[6] The environmental groups were also concerned about the effects that

[5]At the time of these events, BCA was known as Biodiversity Associates. For the sake of simplicity, we use its current name.

[6]The Wilderness Act requires that a wilderness area have "at least five thousand acres of land or . . . sufficient size as to make practicable its preservation and use in an unimpaired condition." 16 U.S.C. § 1131(c)(3). Since recently logged areas are not eligible for wilderness protection, the proposed logging would decrease the eligible acreage of the Beaver Park Roadless Area below the 5,000-acre threshold, potentially compromising its eligibility for

(continued...)

the Veteran/Boulder timber sale would have on the viability of the northern goshawk population in the Forest. Accordingly, they brought administrative challenges to both the particular project and the recently revised plan under which it was approved.

The groups met with mixed success in their administrative challenges. Their challenge to the Veteran/Boulder sale was initially denied in its entirety, though the sale was stayed pending review of the Revised Plan itself. Then, on October 12, 1999, the Chief of the Forest Service upheld the 1997 Revised Plan in most respects, but found that there was inadequate support in the record for the conclusion that the Revised Plan's proposed changes would not threaten the viability of several species, including the northern goshawk. He therefore ordered further research into that question. In the meanwhile, the Forest Service did not stop all pending projects, but instead provided interim directions that would apply until the identified defects in the Revised Plan were remedied. As a result, when the stay on the sale expired, the Forest Service went forward and put the timber out for bid.

The Sierra Club, the Wilderness Society, and BCA brought suit challenging the sale in federal district court, claiming that the Forest Service could not rely on

---

[6](...continued)
wilderness designation for the indefinite future.

an "illegal" plan to justify project-level decisions under that plan. Specifically, they argued that the final environmental impact statement's conclusion that the Veteran/Boulder sale would not affect the viability of the northern goshawk was based on the very findings in the 1997 Revised Plan that had been disapproved.

In the waning days of the Clinton Administration, in September of 2000, the Forest Service signed a settlement agreement with the plaintiff groups, under which it agreed not to allow any tree cutting in the Beaver Park Roadless Area, at least until the Service approved a new land and resource management plan remedying the defects of the 1997 plan. The settlement was approved by the United States District Court for the District of Colorado, which had jurisdiction over the lawsuit because the relevant Forest Service offices were in Colorado.

The process of approving a new plan took much longer than anticipated. The record does not reveal whether the mountain pine beetles of western South Dakota were aware of the settlement agreement or participated in the plan revision process, but it is clear that they did not wait for authorization from Washington before undertaking an expanded program of forest resource exploitation. Just two years after the initial Veteran/Boulder environmental impact statement, the mountain pine beetle infestation in this section of the Black Hills had reached epidemic proportions. According to Forest Service estimates, the pine beetles killed 114,000 trees in 2002, as compared to only 15,000 in 1999.

This convinced forest managers that immediate harvesting of deadwood and infested trees, which the settlement agreement prohibited, was necessary to guard against further spread of the infestation and potentially disastrous forest fires.

Given that approval of a corrected resource management plan was still a long way off, the Forest Service and the local South Dakota interests that shared its concerns had a choice: they could either attempt to obtain consent to the tree cutting from the original parties to the agreement, or with the help of South Dakota's congressional delegation, they could attempt to overturn the settlement agreement's prohibition by legislation. The Forest Service began by trying the consensual approach. Perhaps spurred by the threat of intervention from Congress, the signatories to the settlement met with the Forest Service to discuss changing the agreement in light of the mountain pine beetle problem. The Forest Service reached agreement with the Sierra Club and the Wilderness Society, but BCA and Brian Brademeyer, then chair of the Black Hills Sierra Club, refused to agree to proposed modifications in the settlement. [7] Stymied, South Dakota interests turned to Congress for a legislative solution.

---

[7]Mr. Brademeyer had represented the Sierra Club in the settlement modification negotiations, but resigned after higher-ups in the Sierra Club agreed with the Forest Service to allow certain tree-cutting activities in the Black Hills National Forest, which he considered to be a "suspension of law." Brademeyer Decl. ¶ 13, App. 299-300.

-10-

For some years, Congress had been considering national legislation that would streamline the process of obtaining environmental approval of logging and other clearance projects in fire- and disease-threatened national forests; but these efforts were caught up in the debate over the role of commercial logging in forest restoration. By limiting legislative action to a narrow geographical area, however, and with the acquiescence of some influential environmental groups and the active support of the state's congressional delegation, Congress was able to reach agreement on a bill that would permit logging and other measures in the Beaver Park Roadless Area. In a rider to an unrelated appropriations bill, Congress enacted into law essentially the terms of the modified agreement negotiated between the Forest Service and the Sierra Club and the Wilderness Society. *See* Supplemental Appropriations Act for Further Recovery From and Response to Terrorist Acts on the United States, Pub. L. No. 107-206, § 706, 116 Stat. 820, 864 (2002) (the "706 Rider" or "Rider"). The Rider, which was signed into law on August 2, 2002, required the Forest Service to take a variety of actions that violated the settlement agreement, *see, e.g.*, *id.* § 706(d)(5), 116 Stat. at 867, and prohibited judicial review of those actions, *id.* § 706(j), 116 Stat. at 868. It also specifically referred to the settlement agreement, and stated that the agreement should continue in effect to the extent it was not preempted by the Rider. *See id.*, 116 Stat. at 869.

After the Rider was passed, BCA and Mr. Brademeyer (hereinafter referred to, jointly, as "BCA") went to the federal district court in Colorado to obtain an order requiring continued enforcement of the settlement agreement, claiming that the 706 Rider unconstitutionally trenched on both the executive and judicial branches. The district court denied the motion, and BCA appealed.

DISCUSSION

I

As a preliminary matter, we must determine the scope of this Court's jurisdiction over this case. Although we would normally have jurisdiction under 28 U.S.C. § 1291, the 706 Rider limits that jurisdiction:

> Due to the extraordinary circumstances present here, actions authorized by this section shall proceed immediately and to completion notwithstanding any other provision of law including, but not limited to, NEPA and the National Forest Management Act (16 U.S.C. 1601 et seq.). Such actions shall not be subject to the notice, comment, and appeal requirements of the Appeals Reform Act, (16 U.S.C. 1612 (note), Pub. Law No. 102-381 sec. 322). *Any action authorized by this section shall not be subject to judicial review by any court of the United States.*

Rider § 706(j), 116 Stat. at 868 (emphasis added). At oral argument, BCA contended that the italicized language does not preclude us from considering the constitutionality of the Rider itself. The government disagrees, arguing that we

have jurisdiction at most to determine whether the denial of jurisdiction, not the entire Rider, is constitutional.

In determining the extent of our jurisdiction, we must start with the precise language of the Rider, keeping in mind that such limitations of jurisdiction are to be construed narrowly to avoid constitutional problems. *See Johnson v. Robison*, 415 U.S. 361, 366-67 (1974). What is prohibited here is judicial review of "[a]ny action authorized by" the Rider. Rider § 706(j), 116 Stat. at 868. BCA, however, does not seem to be seeking judicial review of any specific actions already taken or soon to be taken by the Forest Service. Rather, it has moved for enforcement of the settlement agreement in the face of the new Congressional legislation. Admittedly, the basis for the lawsuit, and the alleged injury that gives BCA standing, is the prospect of Forest Service action pursuant to the Rider and in violation of the settlement agreement. Yet at this point, no past or prospective actions of the Forest Service are directly at issue. The question before us is simply whether the settlement agreement has continuing validity in the face of Congress's intervening act.

The situation here is thus different from one in which the court is asked to hold a party who has violated an injunction in contempt. In such a case, the "actions" taken by a party to the injunction are directly at issue. BCA's motion is more analogous to a suit for declaratory judgment holding the Rider itself to be

-13-

unconstitutional.  Because BCA seeks judicial review of the congressional act mandating that the settlement agreement be violated, rather than judicial review of the Forest Service's acts authorized by the Rider, the jurisdictional bar does not apply.  *See Nat'l Coalition to Save Our Mall v. Norton*, 269 F.3d 1092, 1095 (D.C. Cir. 2001).  We therefore must reach the question of whether the Rider is constitutional.  Because this question is purely legal, our review is de novo.  *See United States v. Pompey*, 264 F.3d 1176, 1179 (10th Cir. 2001).

## II

BCA's chief argument is that the Rider trenches on the Executive by giving the Forest Service marching orders so detailed that they go beyond merely "passing new legislation" to interpreting the law, which is "the very essence of 'execution' of the law."  *Bowsher v. Synar*, 478 U.S. 714, 733 (1986).  However, they never clearly explain what, in their view, separates permissible legislation from impermissible interpretation.  The main flaw they find in the Rider is its extreme particularity, making it seem as if their theory is that extreme particularity by itself infringes the Executive's power to enforce and execute the law.  At times, though, they make a more limited claim: that while specificity is not *per se* unconstitutional, at least in this case it is "indicative" of the fact that Congress has unconstitutionally "direct[ed] how law is to be implemented," rather than (constitutionally) changing the applicable law.  Appellants' Reply Br. 5.

-14-

This more limited claim suggests that it is particularity in combination with some other feature that raises the constitutional problem. We consider each theory in turn.

A

BCA bases its argument on a handful of cases in which the Supreme Court has held that the legislative branch cannot play a role in the interpretation and execution of the law. *See, e.g.*, *Metro. Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 271-72 (1991); *Bowsher*, 478 U.S. at 725-26; *INS v. Chadha*, 462 U.S. 917, 951-52 (1983); *Springer v. Philippine Islands*, 277 U.S. 189, 201-02 (1928). There is no basis, however, for BCA's assertion that the sheer specificity of the 706 Rider takes it beyond the realm of Congress's legislative powers. Certainly the cases cited above do not support this position. In each of those cases, Congress sought a role for itself in the execution of the laws, beyond enactment of legislation, through mechanisms such as a one-house legislative veto or the vesting of law-executing powers in officers appointed by, or accountable to, Congress. In *Bowsher*, the Court held that the Comptroller General, who serves at the pleasure of Congress, could not be the officer who determined what spending cuts would be made in order to reduce the deficit under the Gramm-Rudman-Hollings Act of 1985. 478 U.S. at 717-18, 736. *Springer* held that it violated separation of powers for members of

-15-

the legislative branch to be directors of government-owned businesses. 277 U.S. at 202-03. Similarly, *Metropolitan Washington Airports* struck down an arrangement whereby a board of review composed of members of Congress had authority to veto key acts of the Metropolitan Washington Airport Authority. 501 U.S. at 275-77. *Chadha* struck down a law that delegated authority to the Attorney General to suspend certain deportations, but allowed either house of Congress acting alone to veto the Attorney General's decisions. 462 U.S. at 923, 944-59. None of these cases, or any others of which we are aware, suggest that Congress is required to speak with some minimum degree of generality, so as to leave play for the Executive to exercise discretion in interpreting the law. Rather, the Constitution expressly leaves it up to Congress to determine how specific it may deem it "necessary and proper" for the laws to be. U.S. Const. art. I, § 8, cl. 18. The cases cited above have simply forbidden Congress, or its members or servants, from exerting legal authority without observing the formalities for the passage of legislation under the Constitution: "bicameral passage followed by presentment to the President." *Bowsher*, 478 U.S. at 726 (quoting *Chadha*, 462 U.S. at 954-55). This is a structural and institutional means of guaranteeing that Congress stays within the bounds of legislating, and is far superior to asking courts to police the shades of gray between the poles of general and specific.

-16-

To be sure, the Constitution imposes certain specific constraints on the power of Congress to legislate with overmuch particularity. The Bill of Attainder Clause, U.S. Const. art. I, § 9, cl. 3, and the "uniform Duties, Imposts, and Excises" Clause, *id.*, § 8, cl. 1, are examples. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468-73 (1977); *United States v. Ptasynski*, 462 U.S. 74, 80-85 (1983). Due process and equal protection principles similarly prevent Congress from acting with respect to specific persons or groups in some contexts, and specificity may be relevant to determining whether Congress has trenched on the Executive's ability to carry out its specifically enumerated executive powers. *Nixon*, 433 U.S. at 443. But when Congress is exercising its own powers with respect to matters of public right, the executive role of "tak[ing] Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, is entirely derivative of the laws passed by Congress, and Congress may be as specific in its instructions to the Executive as it wishes. Indeed, as the Supreme Court has noted, Congress may even pass legislation governing "a legitimate class of one." *Nixon*, 433 U.S. at 472.

In the instant case, none of the Constitution's explicit restrictions on specificity apply. The Property Clause states that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

-17-

The Supreme Court has "repeatedly observed that the power over the public land thus entrusted to Congress is without limitations." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (internal brackets and quotation marks omitted); *see also Wyoming v. United States*, 279 F.3d 1214, 1227 (10th Cir. 2002). It would be difficult if not impossible to control the use of federal lands without reference to specific actions affecting specific tracts of land, and we see no reason why Congress should be forced to avoid such directives. *See Save Our Mall*, 269 F.3d at 1097 (noting that particularity is especially unproblematic when addressing unique public amenities). The Supreme Court's remark in *Metropolitan Washington Airports* seems relevant here:

> Because National and Dulles are the property of the Federal Government and their operations directly affect interstate commerce, there is no doubt concerning the ultimate power of Congress to enact legislation defining the policies that govern those operations. *Congress itself can formulate the details*, or it can enact general standards and assign to the Executive Branch the responsibility for making necessary managerial decisions in conformance with those standards.

501 U.S. at 271-72 (emphasis added).

Thus, BCA is mistaken when it argues that Congress has arrogated power to itself at the expense of the executive branch because it "specifically ordered the Executive Branch to carry out a duty which had been expressly delegated to the Department of Agriculture, the management of the Black Hills National Forest."

-18-

Appellants' Br. 23.  To give specific orders *by duly enacted legislation* in an area where Congress has previously delegated managerial authority is not an unconstitutional encroachment on the prerogatives of the Executive; it is merely to reclaim the formerly delegated authority.  Such delegations, which are accomplished by statute, are always revocable in like manner; they cannot extend the domain reserved by the Constitution to the Executive alone.  *See Stop H-3 Ass'n v. Dole*, 870 F.2d 1419, 1435 n.24 (9th Cir. 1989).

B

We now turn to consider the view that although the 706 Rider's specificity is unobjectionable in the abstract, it is still unconstitutional because it attempts to mandate specific results *without* changing the underlying environmental laws.  BCA relies for this view chiefly on *Robertson v. Seattle Audubon Society*, where the Supreme Court upheld a similar provision because it "compelled changes in law, not findings or results under old law."  503 U.S. 429, 438 (1992); *see also Apache Survival Coalition v. United States*, 21 F.3d 895, 904 (9th Cir. 1994); *Stop H-3 Ass'n*, 870 F.2d at 1434 (upholding a statute authorizing construction of a highway despite an environmental regulation because it "does not interpret [the relevant regulation's] requirements but rather exempts H-3 from them"); *Armuchee Alliance v. King*, 922 F. Supp. 1541, 1550 (N.D. Ga. 1996).

Far from supporting BCA's position, however, *Seattle Audubon* rejects an argument very much like its own. The case concerned logging litigation to which Congress responded by passing the Northwest Timber Compromise of 1990, applicable only to timber sales entered before September 30, 1990, in thirteen national forests in the Pacific Northwest. The key section of that legislation stated that "Congress determines and directs that management of areas according to [new rules set forth in the Northwest Timber Compromise] . . . meet[s] the statutory requirements that are the basis for [the litigation]." 503 U.S. at 434-35. The Ninth Circuit, below, had held that this did not "establish new law, but direct[ed] the court to reach a specific result and make certain factual findings under existing law in connection with two cases pending in federal court," thus encroaching on the judicial branch under *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872). *Seattle Audubon Soc'y v. Robertson*, 914 F.2d 1311, 1316 (9th Cir. 1990) (*Seattle Audubon I*). In reversing, the Supreme Court criticized the Ninth Circuit's focus on the form of the enactment; instead, it looked to the legal effect of the *Seattle Audubon* provision:

> We conclude that subsection (b)(6)(A) compelled changes in law, not findings or results under old law. Before subsection (b)(6)(A) was enacted, the original claims would fail only if the challenged harvesting violated none of five old provisions. Under subsection (b)(6)(A), by contrast, those same claims would fail if the harvesting violated neither of two new provisions. Its operation, we think, modified the old provisions.

-20-

*Seattle Audubon*, 503 U.S. at 438.

This case follows *a fortiori* from *Seattle Audubon*. Just as in *Seattle Audubon*, the 706 Rider has the practical effect of changing the scope of the government's legal duties. Before the Rider, the Forest Service was prohibited by law from cutting trees without meeting various requirements of various environmental laws; after the Rider, it is required to cut trees in the Black Hills "notwithstanding" those laws. Rider § 706(j), 116 Stat. at 868. But the 706 Rider lacks the problematic language – "the Congress determines and directs that management of areas according to [new rules set forth in the Northwest Timber Compromise] . . . meet[s] the statutory requirements that are the basis for [the litigation]" – which the Ninth Circuit construed as interpreting rather than amending the law. *Seattle Audubon I*, 914 F.2d at 1316. By contrast, the 706 Rider orders that certain actions be taken "notwithstanding" the requirements of certain prior-enacted laws, thus effectively replacing the old standards, in this one case, with new ones. Similar statutes have been upheld as constitutionally valid amendments of the underlying law. *See Save Our Mall*, 269 F.3d at 1097; *Apache Survival Coalition*, 21 F.3d at 904; *Stop H-3 Ass'n*, 870 F.2d at 1434. Thus, we need not decide whether directing specific actions without changing the law would be an unconstitutional attempt by Congress to usurp the Executive's role in

interpreting the law.[8] In accordance with the counsel in *Bowsher*, Congress has influenced the execution of the law here only "indirectly – by passing new legislation." 478 U.S. at 734 (citing *Chadha*, 462 U.S. at 958).

## III

Next, BCA claims that the 706 Rider encroaches on the Judiciary, in three ways: (1) by disturbing final dispositions of cases in violation of *Plaut v. Spendthrift Farms, Inc.*, 514 U.S. 211 (1995); (2) by prescribing rules of decision to the Judiciary in pending cases, in violation of *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871); and (3) by vesting review of judicial decisions in the executive branch, in violation of the rule in *Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792). We reject all three claims.

## A

BCA's first contention, that the 706 Rider impermissibly sets aside a final judicial disposition, depends on a crucial but questionable premise: that the settlement agreement is actually a judicial disposition rather than a mere private

---

[8]We underscore that by relying on the fact that the 706 Rider changed applicable law, we do not mean to suggest, any more than did *Seattle Audubon*, that if the Rider had not changed the law it would necessarily have run afoul of *United States v. Klein*. By interpreting the provision at issue in *Seattle Audubon* as a change in the law, the Supreme Court expressly avoided addressing any such constitutional question. 503 U.S. at 441. Thus, if a provision cannot be read as a change in the law, the most that follows from this case or *Seattle Audubon* is that the constitutional question of whether there is a *Klein* violation must be faced – not that it must be answered in the affirmative.

agreement between the parties. Although the district court did incorporate the settlement agreement by reference in its order dismissing the suit, it nevertheless preferred the latter characterization in addressing BCA's current request for injunctive relief:

> This case doesn't even rise to the level where the Court executed a consent decree. This is a case where the parties sat down among themselves and settled the case. The more proper analogy here is to an executory settlement contract. It is true that the Court approved the settlement agreement, but that is different from a consent decree.
> . . . .
> . . . [A]s far as I'm concerned, the Court's approval of the settlement agreement is entitled to very, very little weight, because it was negotiated among the parties.

Tr. of Mot. Hr'g dated Dec. 26, 2002, at 12, App. 405. Nevertheless, because the settlement agreement was a judicial disposition in form if not in substance, we assume for purposes of this appeal that it is entitled to the same constitutional protection that it would have if the court had decided its terms.

1

Within the scope of its enumerated powers, Congress has authority to enact laws to govern matters of public right, such as the management of the public lands, and authority to change those laws. Even when the Judiciary has issued a legal judgment enforcing a congressional act – for example, by a writ of injunction – it is no violation of the judicial power for Congress to change the

-23-

terms of the underlying substantive law.  The purpose of an injunction is to define and enforce legal obligations, not to freeze them into place.  Thus, when Congress changes the laws, it is those amended laws – not the terms of past injunctions – that must be given prospective legal effect.  *See, e.g.*, *Miller v. French*, 530 U.S. 327, 347-50 (2000); *Hall v. Beals*, 396 U.S. 45, 48 (1969); *System Fed'n No. 91 v. Wright*, 364 U.S. 642, 648-650 (1961); *Am. Steel Foundries v. Tri-City Cent. Trades Council*, 257 U.S. 184, 201-07 (1921).

The Supreme Court applied this principle to dispose of a contention very similar to BCA's as long ago as 1855, in the venerable case of *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421 (1855).  In that case, Pennsylvania had previously brought suit to enjoin the construction of a bridge over the Ohio River, which would obstruct access to Pennsylvania's ports.  The Supreme Court eventually granted an injunction requiring the bridge to be removed or raised.  It reasoned that because Congress had "regulated the navigation of the Ohio River, and had thereby secured to the public, by virtue of its authority, the free and unobstructed use of the same," the Virginia-authorized bridge impeding travel on the Ohio River was "in conflict with the acts of congress, which were the paramount law."  59 U.S. (18 How.) at 430 (summarizing the earlier opinion).

-24-

Thereafter, Congress passed a new law authorizing the construction of the bridge and stating that the bridge and one other were "lawful structures in their present positions and elevations." *Wheeling Bridge*, 59 U.S. (18 How.) at 429. Pennsylvania sued again, claiming that the intervening enactment was an unconstitutional attempt to overturn a final decision of the Judiciary. The Supreme Court disagreed:

> [I]f the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress. It would have depended, not upon the public right of the free navigation of the river, but upon the judgment of the court. . . . But that part of the decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance. Now, whether it is a future existing or continuing obstruction depends upon the question whether or not it interferes with the right of navigation. If, in the mean time, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of the court cannot be enforced. There is no longer any interference with the enjoyment of the public right inconsistent with the law, no more than there would be where the plaintiff himself had consented to it, after the rendition of the decree.

*Id.* at 431-32. Central to the Court's analysis was the fact that the right to unobstructed waterways was a "public right . . . under the regulation of congress." *Id.* at 431. In other words, the plaintiff had no vested property right in an

-25-

unobstructed waterway. The core violation was against Congress's right to control the waterways, and Pennsylvania's right to an unobstructed waterway was only the derivative right to enjoy whatever degree of navigation Congress saw fit to allow. So long as the will of Congress was to leave the river unimpeded, any impediment was a violation of the public right thus defined. But once Congress changed its mind, the contours of that right changed, and there was no more ground for injunctive relief. If a landowner grants her neighbor a revocable license to use a private road across her property, the neighbor could conceivably obtain an injunction against any third party who prevents him from using that road. However, that does not affect the right of the landowner to revoke the license at any time. Should the license be revoked, the neighbor's right to use the private road ceases, and enforcing the injunction is no longer appropriate.

2

*Wheeling Bridge* has remained a fixed star in the Supreme Court's separation-of-powers jurisprudence, and numerous subsequent cases have relied on it. *See, e.g.*, *The Clinton Bridge*, 77 U.S. 454, 463 (1870) (concluding, on the basis of *Wheeling Bridge*, that in public rights cases, Congress could not only modify injunctive relief already granted, but also could "g[i]ve the rule of decision" in pending cases); *Hodges v. Snyder*, 261 U.S. 600, 603 (1923) (noting that the normal rule against disturbing final judgments "does not apply to a suit

-26-

brought for the enforcement of a public right, which, even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced"); *Sys. Fed'n No. 91*, 364 U.S. at 648-650 (holding that it is an abuse of discretion for a district court not to modify an injunction to reflect changes in underlying law); *Miller v. French*, 530 U.S. at 347-48.

Even *Plaut v. Spendthrift Farms, Inc.*, the principal case on which BCA relies, is careful not to disturb the holding of *Wheeling Bridge*. There the Supreme Court had previously imputed a uniform nationwide statute of limitations on actions brought under § 10(b) of the Securities Echange Act of 1934, *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), and held that the newly established statute of limitations applied to all pending cases in the federal courts. *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991). Six months later, Congress passed a law changing the statute of limitations for those cases commenced before *Lampf* to what it would have been had the Supreme Court not imposed a uniform nationwide limitations period, and reinstating all actions dismissed as time-barred if they would have been timely under the limitations period of their local jurisdiction. *See* Federal Deposit Insurance Corporation Act of 1991, Pub. L. No. 102-242, sec. 476, § 27A, 105 Stat. 2236 (codified at 15 U.S.C. § 78aa-1 (1988 Supp. V)). The Supreme Court

held that this action violated the separation of powers by requiring federal courts to reopen final judgments. *Plaut*, 514 U.S. at 240. It reasoned that once the judicial branch has given its final word on a case, to allow Congress to reopen the case by legislation would destroy the power of the Judiciary to render final judgments. *Id.* at 219. Instead, Congress would be in effect a court of last resort to which one could appeal any "final" decision of the Judiciary.

In rejecting such an outcome, the Court in *Plaut* did no more than follow the dicta of *Wheeling Bridge* itself:

> But it is urged, that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby in favor of the plaintiff. This, as a general proposition, is certainly not to be denied, especially as it respects adjudication upon the *private rights of the parties*. When they have passed into judgment the right becomes absolute, and it is the duty of the court to enforce it.
> . . . .
> Now, we agree, if the remedy in this case had been an action at law, and a judgment rendered in favor of the Plaintiff *for damages*, the right to these would have passed beyond the reach of the power of congress.

*Wheeling Bridge*, 59 U.S. (18 How.) at 431 (emphasis added), *quoted in Plaut*, 514 U.S. at 226. As *Plaut* itself insists, it does not call the holding of *Wheeling Bridge* into question at all. 514 U.S. at 232. The disturbed court decision in *Plaut* definitively resolved a private claim to a certain amount of money, leaving the defendants with an unconditional right to the sum in question; the judgments

in this case and in *Wheeling Bridge* merely prohibited future interference with the enjoyment of a public right that remained revocable at Congress's pleasure.

The Supreme Court has since reaffirmed the continued vitality of *Wheeling Bridge* in *Miller v. French*. In that case, the Prison Litigation Reform Act had set new limits on the power of courts to give injunctive relief to prisoners, requiring (among other things) that any injunctive relief granted be both narrowly drawn to correct the violation of federal rights and also the least intrusive means of correcting the violation. 18 U.S.C. § 3626(a)(1)(A). The provision at issue in *Miller* directed that an action to modify or terminate injunctive relief pursuant to the PLRA would act as an automatic stay of any existing injunctive relief if a court did not find that the injunctive relief remained appropriate under the new standards within 30 days. *Id.* § 3626(b)(2).

In upholding the PLRA's automatic stay, the Supreme Court found *Wheeling Bridge* controlling, distinguishing *Plaut* because in that case Congress had disturbed final judgments in actions for money damages. *Miller*, 530 U.S. at 344-45. The Court held that when courts grant prospective injunctive relief, they remain obligated to modify that relief to the extent that "subsequent changes in the law" render it illegal. *Id.* at 347.

3

This case falls squarely within the principle of *Wheeling Bridge*. BCA's members' rights with respect to the national forests is a "public right . . . under the regulation of congress," *Wheeling Bridge*, 59 U.S. (18 How.) at 431, in exactly the same way that the right to unimpeded navigation of the Ohio River was. Both rights are entirely contingent on Congress's continuing will that the federal lands or interstate waterways be managed in a particular way. The settlement agreement in the Veteran/Boulder matter in no way touched on vested private rights. To be sure, the private interests of BCA's members are sufficiently affected to give rise to standing, but the interest they represented in their lawsuit was nothing other than the interest of the public in seeing that Congress's environmental directives are observed by the Forest Service.

BCA's attempts to distinguish *Miller* and *Wheeling Bridge* are unavailing. It argues, first, that in those cases, Congress simply changed the law, leaving it for the courts to decide whether to modify their injunctions, whereas here Congress is directly requiring the courts to modify the settlement agreement. We see no such distinction. In those cases, as here, Congress enacted rules in direct conflict with existing legal obligations. In those cases, as here, courts later had to decide whether those previous legal obligations remained enforceable in light of Congress's act.

Second, BCA argues that the 706 Rider specifically refers to a particular settlement agreement it means to supercede, whereas the PLRA provision in *Miller* "did not speak directly to any pre-existing judicial ruling or issuance of relief." Appellants' Br. 27. The same was true in *Wheeling Bridge*. There, legislation was targeted at two named bridges, one of which was the subject of the injunction in the case. *See* 59 U.S. (18 How.) at 429. It is true that in *Seattle Audubon*, the Court declined to address the question of whether such targeting raised a constitutional problem. 503 U.S. at 441. However, its silence ended four years later in *Plaut*. There, a concurrence found a constitutional violation precisely because the reopening of dismissed cases "applie[d] only to a few individual instances." 514 U.S. at 243 (Breyer, J., concurring). A majority of the Court rejected that position, describing it as "wrong in law." *Id.* at 238. The majority concluded that the infringement of the judicial power consisted "*not* of the Legislature's acting in a particularized and thus (according to the concurrence) nonlegislative fashion; but rather of the Legislature's nullifying prior, authoritative judicial action. It makes no difference whatever to that separation-of-powers violation that it is in gross rather than particularized." *Id.* at 239 (emphasis in original; footnote omitted); *see also id.* at 239 n.9 ("While legislatures usually act through laws of general applicability, that is by no means their only legitimate mode of operation.").

To avoid constant interbranch friction, the lines separating the branches should be clear. As the Supreme Court noted in *Plaut*, and as BCA's arguments illustrate, it only "prolongs doubt and multiplies confrontation" to make the constitutional analysis hinge on the murky distinction between generalized lawmaking and particularized application of the law. 514 U.S. at 240.

4

It is true that the injunction BCA seeks to enforce differs from the one in *Wheeling Bridge* in that it is the product of a settlement agreement rather than a product of a judicial declaration of right. Thus, Appellants' claimed right to keep Beaver Park unmolested might be said to rest directly on the terms of their contractual agreement, and only indirectly on public rights provided by the environmental laws. We must therefore consider whether the settlement agreement has interposed a new set of contractual rights that adequately support keeping the injunction in place, making changes to the scope of the underlying public right irrelevant.

A negative answer to that question has been clear since at least 1961, when the Supreme Court decided *System Federation No. 91 v. Wright*, 364 U.S. 642, 648-650 (1961). In that case, several nonunion railway employees brought a class action against the railroad and various unions for discrimination against them and other nonunion workers. The district court eventually entered a consent decree

enjoining the defendants "from discriminating against the plaintiffs and the classes represented by them in this action by reason of or on account of the refusal of said employees to join or retain their membership in any of defendant labor organizations, or any labor organization." *Sys. Fed'n*, 364 U.S. at 644. At the time, labor law did not allow collective bargaining agreements to require union shops. *Id.* at 645-46.

Later, when the applicable law had changed to allow such contracts, the unions sought modification of the decree to make it clear that it would not prevent them from bargaining for a union shop. *Id.* The district court refused to modify the injunction; since nothing in the amended law made it illegal for parties to agree *not* to have a union shop, the court concluded that the parties were stuck with their agreement. *Id.*

The Sixth Circuit affirmed, but the Supreme Court reversed, holding that the district court's refusal to modify the decree was an abuse of discretion. *Id.* at 646, 650-53. The Court reasoned that, under *Wheeling Bridge*, the district court would have had to modify the decree if it had been the result of litigation instead of consent. *Id.* at 650-51. It then concluded that the same principles applied to consent decrees:

> The result is all one whether the decree has been entered after litigation or by consent . . . . In either event, a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has

-33-

been turned through changing circumstances into an instrument of wrong. We reject the argument . . . that a decree entered upon consent is to be treated as a contract and not as a judicial act . . . .

*Id.* at 650-51 (quoting *United States v. Swift & Co.*, 286 U.S. 106, 114-15 (1932) (Cardozo, J.)) (some ellipses in original). The Court's reasons are also applicable here:

> The parties cannot, by giving each other consideration, purchase from a court of equity a continuing injunction. In a case like this the District Court's authority to adopt a consent decree comes only from the statute which the decree is intended to enforce. Frequently of course the terms arrived at by the parties are accepted without change by the adopting court. But just as the adopting court is free to reject agreed-upon terms as not in furtherance of statutory objectives, so must it be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives. In short, it was the Railway Labor Act, and only incidentally the parties, that the District Court served in entering the consent decree now before us. The court must be free to continue to further the objectives of that Act when its provisions are amended. The parties have no power to require of the court continuing enforcement of rights the statute no longer gives.

*Id.* at 651. Put briefly, a settlement agreement or consent decree designed to enforce statutory directives is not merely a private contract. It implicates the courts, and it is the statute – and "only incidentally the parties" – to which the courts owe their allegiance. The primary function of a settlement agreement or consent decree, like that of a litigated judgment, is to enforce the congressional

-34-

will as reflected in the statute. The court should modify or refuse to enforce a settlement agreement or proposed decree unless it is "in furtherance of statutory objectives." The agreement or consent decree is contractual only to the extent that it represents an agreement by the parties regarding the most efficient means of effectuating their rights under the statute. It does not freeze the provisions of the statute into place. If the statute changes, the parties' rights change, and enforcement of their agreement must also change. Any other conclusion would allow the parties, by exchange of consideration, to bind not only themselves but Congress and the courts as well.

This principle applies even more clearly here than it did in *System Federation* itself. There, the original injunction was not inconsistent with the new law; it merely ruled out an option that Congress had since made permissible but not mandatory. If that injunction had to change, then *a fortiori* the injunction at issue here, which *is* inconsistent with the 706 Rider, must give way.

B

Having disposed of the claim that the 706 Rider disturbs the district court's *final judgment* in violation of *Plaut*, we turn to BCA's somewhat inconsistent claim that the Rider violates *United States v. Klein* because it dictates "rules of decision" to the district court in a *pending* case.

*Klein* involved one episode in a series of conflicts between the Reconstruction Congress and the balking President Andrew Johnson. Various presidential proclamations had offered a "full pardon, with restoration of all rights of property," to certain broad classes, conditioned on taking an oath of loyalty. *Klein*, 80 U.S. (13 Wall.) at 139-40. In the Abandoned and Captured Property Act, 12 Stat. 820 (Mar. 12, 1863), however, Congress provided that the owner of seized property could sue in the Court of Claims to recover its proceeds only on proof that the owner "had never given aid or comfort to the rebellion." *Id.* at 138-39. In *United States v. Padelford*, 76 U.S. (9 Wall.) 531, 542-43 (1869) (mem.), the Supreme Court held that a presidential pardon renders the pardoned "as innocent as if he had never committed the offense," and concluded that proof of pardon was equivalent to proof that the claimant had not aided the rebellion. Congress responded to *Padelford* by passing an appropriations proviso directing the Court of Claims to take the fact of a pardon, with some narrow exceptions, as conclusive proof that the claimant *had* "given aid or comfort to the rebellion," and as grounds for dismissing the claimant's suit. *Klein*, 80 U.S. (13 Wall.) at 142-43. The proviso also removed the Supreme Court's authority to hear appeals of such suits. *Id.* at 144-45. In *Klein*, the administrator of the estate of V.F. Wilson, who had taken the oath and qualified for the pardon, sued to recover the proceeds of Wilson's seized property. *Id.* at 136, 143. The Supreme

Court found the proviso to be unconstitutional, both because it attempted to impair the effect of a presidential pardon and because it "prescribe[d] rules of decision to the Judicial Department of the government in cases pending before it." *Id.* at 146.

*Klein* is a notoriously difficult decision to interpret. Read broadly, the "rules of decision" language of *Klein* would seem to contradict the well-established principle that courts must decide cases according to statutes enacted by Congress. *See United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 109 (1801); *Miller*, 530 U.S. at 344, 346-47.

In any event, the 706 Rider is very different from the unusual legislation found unconstitutional in *Klein*. Central to the Court's analysis in *Klein* was its conclusion that the government's seizure of the private property at issue did not divest its owner of his property rights. *See Klein*, 80 U.S. (13 Wall.) at 136-39. Thus, the basis of the *Klein* suit (at least in the eyes of the *Klein* court) was a private right to property vindicated by a presidential pardon, which Congress was therefore powerless to extinguish. *See id.* at 148. Since Congress could not manipulate these private rights, *Klein* merely refused to allow Congress to accomplish indirectly (by manipulating the judiciary's interpretation of those private rights) what it could not accomplish directly.

Thus understood, *Klein* is precisely in accord with *Wheeling Bridge,* as *Klein* itself observes. *See* 80 U.S. (13 Wall.) at 146-47. When Congress does not control the substance of a right, there are limits to its ability to influence the judiciary's determination of that right, either by directing the judiciary to decide a particular way, or by setting aside judicial determinations after the fact. But when rights are the creatures of Congress, as they were in *Wheeling Bridge*, Congress is free to modify them at will, even though its action may dictate results in pending cases and terminate prospective relief in concluded ones. Thus, *Klein*'s prohibition on prescribing rules of decision in pending cases has no application to public rights cases like this one.

The Supreme Court explicitly made this point in *The Clinton Bridge*, a case decided only one year before *Klein*. That case addressed facts almost identical to those in *Wheeling Bridge*. The only difference was that Congress passed legislation authorizing the bridge in question while the suit over its legality was still pending, not after the injunction issued. *See* 77 U.S. (10 Wall.) at 462-63. The Court noted that, in so doing, Congress "gave the rule of decision for the court" in the pending case. *Id.* at 463. While it found that to be unobjectionable under *Wheeling Bridge*, it warned that "very different considerations would have arisen" if Congress had attempted to dictate the rule of decision in a case

concerning a "private right of action." *Id. Klein* must be read as the fulfillment of that narrow warning, not the enunciation of any broader principle.[9]

Furthermore, the Supreme Court has made it clear that *Klein* does not apply to cases like this one: "Whatever the precise scope of *Klein*, . . . its prohibition does not take hold when Congress amends applicable law." *Plaut*, 514 U.S. at 218, *quoted in Miller*, 530 U.S. at 349 (internal quotation marks and brackets omitted). Because, as we explained in Part II of this opinion, the 706 Rider did "amend[] applicable law," the *Klein* principle does not apply here.

C

Last, BCA claims that the 706 Rider violates the rule in *Hayburn's Case*. *Hayburn's Case* has come to stand "for the principle that Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch." *Plaut*, 514 U.S. at 218. BCA admits that the 706 Rider does not literally authorize Forest Service officials to review judicial determinations. Nevertheless, it maintains that the 706 Rider orders the Executive to ignore and violate judicial orders, and that this is close enough to make out a claim under *Hayburn's Case*.

---

[9]The same analysis disposes of BCA's contention that the 706 Rider disturbed the result in another then-pending case, *Sierra Club-Black Hills Group v. United States Forest Serv.*, No. 94-D-2273 (D. Colo. Feb. 20, 2003). Subsections (h) and (i) of the Rider directed the Forest Service to take specific actions in the Norbeck Wildlife Preserve, the area under dispute in the *Sierra Club* litigation.

We disagree. As discussed above, it is well-established that new law can modify old injunctive decrees. Whenever that happens, the new law at least implicitly orders the Executive to ignore the old decrees.

BCA maintains that in such circumstances, Congress's act cannot constitutionally modify an injunction directly. Instead, it claims, any modification must be the made by the court itself (though the court may be obliged to do it), and until the court does so, the injunction remains in force. Thus, because the 706 Rider directs the Forest Service to proceed with its tree-cutting activities regardless of whether the court modifies the settlement agreement, it unconstitutionally directs the Executive to ignore an injunction in force. But this is not the lesson of our cases. *Wheeling Bridge* held, not merely that Congress's legislation made modification of the injunction necessary, but that it rendered the injunction unenforceable. 59 U.S. (18 How.) at 432; *Miller*, 530 U.S. at 346. Similarly, the provision upheld in *Miller v. French* went beyond ordering judges to stay prospective relief after 30 days; instead, it stated that a motion to terminate injunctive relief "shall operate as a stay" of that relief beginning 30 days after the motion – thus staying the injunctive relief without any action by the court. *Miller*, 530 U.S. at 331. When Congress is acting within the boundaries set by *Wheeling Bridge* and *Miller*, the parties to a modified injunction

need not wait upon the court to ratify the congressional change. Thus, we see no violation of *Hayburn's Case* or any other constitutional principle here.

IV

Viewed realistically, the 706 Rider intrudes on neither executive nor judicial authority. The Rider comports with the current view of executive branch officials regarding management of the national forest. And while the Rider overrides a settlement agreement entered by the district court, that agreement was in fact a private agreement between the parties, in which the Judiciary had little or no independent involvement. To overturn the Rider would thus serve not to vindicate the constitutionally entrusted prerogatives of those two branches, but rather to keep in place a private group's own preferences about forest preservation policy in the face of contrary judgments by the Executive and Congress. True principles of separation of powers prevent settlement agreements negotiated by private parties and officials of the executive branch from encroaching either on the constitutionally vested authority of Congress or on the statutorily vested authority of those officials' successors in office. BCA's claim amounts to the argument that an agreement forged by a private group with a former administration, without serious judicial involvement, can strip both Congress and the Executive of their discretionary powers. The Constitution neither compels nor permits such a result.

The executive branch does not have authority to contract away the enumerated constitutional powers of Congress or its own successors, and certainly neither does a private group. [10] Accordingly, the governance of the Black Hills National Forest must be conducted according to the new rules set by Congress, as Article IV of the Constitution provides.

For the foregoing reasons, the district court's denial of BCA's motion is AFFIRMED.

---

[10]Even when the Government unmistakably contracts not to exercise its sovereign powers in otherwise permissible ways, that promise cannot be enforced by injunction, as BCA seeks to do here. At most, such a contract may give rise in certain circumstances to a suit for damages. *See United States v. Winstar Corp.*, 518 U.S. 839, 910 (1996) (plurality opinion); *id.* at 923 (Scalia, J., concurring); *Perry v. United States*, 294 U.S. 330, 351-53 (1935); *Lynch v. United States*, 292 U.S. 571, 580 (1934); *The Sinking Fund Cases*, 99 U.S. 700, 718-19 (1878). As the plurality stated in *Winstar*,"[t]he Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act." 518 U.S. at 881-82 (quoting *Amino Bros. v. United States*, 372 F.2d 485, 491 (Ct. Cl. 1967)). Appellants have made no claim for damages in this case, nor could they.